Jim B. EDMONDS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15207.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 30, 1959.

Decided Dec. 10, 1959.

Mr. Edward J. Skeens, Washington, D. C., for appellant.

Mr. Carl W. Belcher, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and William W. Greenhalgh, Asst. U. S. Atty., were on the brief, for appellee.

Before PRETTYMAN, Chief Judge, and EDGERTON, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting *en banc*.

WILBUR K. MILLER, Circuit Judge.

On May 10, 1957, Jim B. Edmonds was found guilty of murder in the second degree under the first count of an indictment which charged him with first degree murder in that on or about November 18, 1956, he "purposely and with deliberate and premeditated malice, murdered George P. Lefebvre by means of strangling him with a pillow case and with his hands." He was also found guilty under the fourth and last count of the indictment which charged that on the same day he stole Lefebvre's automobile.[1] Edmonds appealed, and on September 15, 1958, this court by a 6–3 vote reversed the convictions and remanded the case for a new trial.[2]

The District Court on November 10, 1958, ordered Edmonds to be retried for second degree murder under the first degree count. At the second trial, which ended November 26, 1958, Edmonds was tried only for murder in the second degree under the first count and was again

---

1. He was found not guilty under the second count which charged that he strangled Lefebvre in the perpetration of a robbery, and under the third count which accused him of stealing Lefebvre's car keys worth $1.00 and $9.00 in currency which was in Lefebvre's wallet.

2. There was no majority opinion. Four judges joined in an opinion giving their reasons for reversal, and two other judges concurred only in the result reached therein. Three judges filed a dissenting opinion. 104 U.S.App.D.C. 144, 260 F.2d 474.

found guilty, and was also found guilty of grand larceny under the fourth count. He appeals.

The facts are these: on November 27, 1956, the badly decomposed body of George P. Lefebvre was found on the floor of his Georgetown apartment, clad only in underwear, with a pink pillow case twisted about the neck. An autopsy revealed that death caused by strangulation had occurred about ten days before. Fingerprint experts examined various articles in the apartment and found on a saucer a fingerprint which was identified as that of Jim B. Edmonds. Police searched the area for a 1955 Chevrolet convertible known to have been owned by Lefebvre but failed to find it.

In the meantime, on November 26, 1956, a police officer of Dougherty County, Georgia, investigating an automobile accident which had just occurred there, found a 1955 Chevrolet convertible overturned and badly damaged. The driver, who proved to be the appellant, had already been removed to a hospital in nearby Albany and was immediately interviewed there by the investigating officer. Asked as to the ownership of the automobile, Edmonds said it belonged to a friend of his and exhibited a District of Columbia registration certificate or identification card in the name of George Lefebvre. He stated he had borrowed the car and was home on leave, and that he had deliberately wrecked the vehicle in an effort to kill himself.

It developed that Edmonds was an enlisted man in the U. S. Marine Corps and was absent without official leave from his duty station at the Marine Barracks in the District of Columbia. Marine Corps officials took him into custody at the hospital on November 26, and held him in the brig at Albany, Georgia, until December 1, when he was turned over to Sergeant George R. Donahue of the homicide squad of the District of Columbia Metropolitan Police.

Cecil M. Franklin, a special agent of the Federal Bureau of Investigation, then stationed at Albany, Georgia, testified that shortly after 9:00 a. m. on November 30, 1956, he and Sergeant Donahue interviewed Edmonds at the Marine Corps brig in Albany. At the outset, he said, Edmonds was advised by Donahue "that he didn't have to tell us anything; he didn't have to talk to us; anything he did tell us could be used against him and that he had the right to consult an attorney before making a statement." Franklin was then asked, "And having been so advised, did the defendant indicate that he wished to talk about this case?" The reply was, "Yes, sir, he did." At this point, counsel for Edmonds renewed his pretrial motion to suppress any oral or written statement made by him. The motion was denied.

We quote from the testimony of Agent Franklin given on direct examination:

"Q. Will you proceed and tell His Honor and the Jury what the defendant said about this case?

\* \* \* \* \* \*

"A. The defendant, Mr. Edmonds, told us that on the 17th of November, he had been assigned to the Marine Corps here in Washington, D. C. in the barracks, and on that date he decided—well, prior to that time some of the individuals at the base had learned about an unfortunate incident in his earlier life, and had commenced to kid him about it. He had talked to his Lieutenant and have been—and the Lieutenant had suggested to the Captain that he be afforded a psychiatric examination in Arlington. He was afforded this examination and from what he told us, the doctor recommended no treatment. Anyhow, on the 17th of November, he decided he was going AWOL and go back to his home.

"His father had recently returned home and he was a little concerned about the safety of his family down there. On this night he met a friend of his, Jack Price, here in Washington, D. C., and I believe that was at Guy's Place. They stayed there for a while and they went and had something to eat.

"Thereafter, he left Jack Price and went to see a girl friend of his out in the neighborhood of 31st and M Streets, here in Washington. When he arrived at her home he found that she was not there, so he went back to the corner of 31st and M in order to catch a cab.

"Q. Did he tell you what time it was, or approximately what time it was when he left his girl friend's house and went to 31st and M to catch a cab?

"A. It would have been about— after one or two o'clock on the morning of the 18th. The morning of the 18th. While he was standing there waiting to catch this cab, or trying to catch a cab, he noticed an individual, a single man, drive by four or five times in a 1955 Chevrolet convertible automobile. This car was red and white. After a short time, the individual parked the car on 31st Street and approached him on the corner of 31st and M.

"This man stood and stared at Mr. Edmonds for a short time, and then asked him if he would like to have a cup of coffee. Edmonds asked him what his angle was, and the man told him nothing. Then he asked him where they were going to get coffee at that time of the morning, and the man said in his apartment.

"So they proceeded to an apartment in the immediate neighborhood, and as they went in this man turned the radio on and Mr. Edmonds sat down in the front room. The man returned after putting the coffee pot on, apparently, and sat and stared at Mr. Edmonds some more. They drank the coffee and got into conversation. The man asked Edmonds his name. He told Edmonds that he had been in the army for ten or twelve years himself. Then he asked Edmonds if he would like to rest a while before going back to the barracks. Edmonds said that he would, took off part of his clothing.

"Q. Who took off the clothing?

"A. Edmonds took off his shoes and tie, I believe it was, and laid down on the sofa in the front room. After he had laid down, this individual, the other man, came—turned off the lights, and came over and sat on the edge of the bed. He commenced making advances of a homosexual nature towards Edmonds. Edmonds told him to stop and pushed him away. The individual came back and at that time he engaged in a struggle. Edmonds pushed the man to the floor and put his hands around his throat and choaked [sic] him. The man stopped struggling, apparently. He then started to get up. He reached up on the couch and obtained a piece of cloth, or obtained something, and wrapped it around the man's throat, and pulled on that for a little bit.

"After the man was quiet, he got up, put his clothes back on and went to the closet and got the car keys, eight or nine dollars in money from the man's trousers, and then went and got in the car where it had been parked on 31st and M, drove the car from there down to West Virginia, spent the night there, and drove on down to Albany. He stayed around Albany for several days."

Sergeant Donahue's testimony concerning the statements made by Edmonds on November 30, 1956, was similar to that given by Agent Franklin which has just been quoted.

Jack Price, the friend of Edmonds referred to in Franklin's testimony, was a witness for the Government. He said that, pursuant to an appointment, he met Edmonds in a bar at about 9:00 p. m. November 17, 1956. They went immediately to a dance in nearby Maryland, and returned shortly before midnight, stopping at a restaurant on the way. Then, with Edmonds driving Price's car, they went 30 or 40 miles toward Warrenton, Virginia, to find a place recommended by appellant. Price finally asked him to stop the car, saying he did not want

to go any further. Edmonds suggested that, as they had gone that far, they should proceed to Charleston, West Virginia, but Price declined because the car belonged to his employer. Edmonds suggested they return and get Price's personal car and then go to Charleston. Upon their return to Price's apartment where they had food, Edmonds continued to insist they go to West Virginia, but Price refused. He gave Edmonds money for cab fare and told him to go to Bolling Air Force base and get a "hop," *i. e.*, a free plane ride to West Virginia. Edmonds left Price's apartment about 2:30 or 3:00 a. m. on November 18, 1956.

The appellant took the stand at the first trial and testified rather fully concerning the details of the killing. At the second trial, as a part of the Government's case in chief, the prosecuting attorney read to the jury certain excerpts from appellant's testimony at the first trial as constituting judicial admissions. This was done over the objection of Edmonds. In an appendix to this opinion, we reproduce the material read by the prosecuting attorney, omitting for the sake of brevity certain passages which seem immaterial to Edmonds' narrative of the events of the fatal morning.

■ The first reason for reversal advanced by appellant is that it was error to deny his motion to suppress his oral statement to Agent Franklin and Officer Donahue, and his objection to their testimony concerning his admissions. He says the oral statement was obtained in violation of Rules 4, 5 and 40 of the Federal Rules of Criminal Procedure [18 U.S.C.A.]. Rule 4 has to do with a warrant or summons issued upon complaint; we see no reason for saying it was violated here.

Rule 5 has to do with the proceedings before the Commissioner. It provides that an officer making an arrest under a warrant or any person making an arrest without a warrant "shall take the arrested person without unnecessary delay before the nearest available commissioner * * *," who shall inform him

of his rights. The Supreme Court has held that a confession given during unnecessary delay between arrest and presentation to a committing magistrate is inadmissible, regardless of whether the delay induced the accused to confess. Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. But here, the oral statement which appellant says was inadmissible because of Rule 5 was made by him before he was arrested, and after he had been cautioned about making it. He was at the time already legally detained, being in the custody of the Marine Corps, and no effort at arrest had been made by the civil officers. Moreover, there was no extensive interrogation; the statements were made in a matter of minutes and in response to a single inquiry. In these circumstances, there was no violation of Rule 5.

For the same reasons, Rule 40 seems to us to be immaterial upon the issue of the admissibility of the statements; it treats of the removal of an arrested person from one district to another, and provides that one arrested on a warrant issued in a distant district may have a hearing before being removed thereto.

We hold the trial court did not err in permitting Franklin and Donahue to testify concerning the oral statement Edmonds voluntarily made to them on November 30.

■ Edmonds says the trial court erred in permitting parts of his testimony to be read to the jury at the second trial, at which he did not take the stand, although he admitted the accuracy of the transcript which was used. The reception of his statements at the prior trial violated his privilege against self-incrimination, it is argued.

It is generally held, unless a statute directs otherwise, that a defendant in a criminal case who takes the stand in his own behalf and testifies without asserting his privilege against self-incrimination thereby waives the privilege as to the testimony given so that it may be used against him in a subsequent trial

of the same case.[3] The fact that the defendant does not take the stand at the second trial does not prevent the use of his testimony given at the former trial, if it would otherwise be admissible. Heller v. United States, 7 Cir., 57 F.2d 627, certiorari denied 1932, 286 U.S. 567, 52 S.Ct. 647, 76 L.Ed. 1298; State v. Simmons, 1908, 78 Kan. 852, 98 P. 277; State v. Kimes, 1911, 152 Iowa 240, 132 N.W. 180; State v. McPherson, 1915, 77 Or. 151, 149 P. 1021; State v. King, 1917, 102 Kan. 155, 169 P. 557; Scherpig v. State, 1929, 112 Tex.Cr.R. 61, 13 S.W. 2d 872.

That this court has followed the general trend of authority is shown by the decision to which we now refer. In Milton v. United States, 1940, 71 App. D.C. 394, 110 F.2d 556, Milton's conviction of uttering a check bearing a forged endorsement was affirmed. Apparently he did not take the stand. The Government was permitted to read to the jury certain portions of the transcript of Milton's testimony at a former trial for housebreaking and larceny. We held the evidence was properly received to prove Milton's voluntary admissions, and quoted with approval the rule stated in Rafferty v. State, 1891, 91 Tenn. 655, 665–666, 16 S.W. 728, 730:

> " * * * 'It is true that there was no power to compel the defendant to testify against herself; but having voluntarily gone on the witness stand in her own behalf on the former trial, and there made statements against her interest, it was entirely competent for the state, on the second trial, to prove those statements as admissions voluntarily made. Admissions made under such circumstances may be proven in the same manner and for the same reasons that admissions made out of court may be proven.' "

In Warde v. United States and Walling v. United States, 1946, 81 U.S.App.D.C. 355, 158 F.2d 651, this court said: "Testimony of appellant Walling at a previous trial, together with a bank statement to which it related, were rightly admitted since this testimony had some tendency to establish his guilt." We cited the Milton case in support of the holding.

On the basis of these authorities, we conclude the trial court did not err in permitting portions of Edmonds' testimony at the first trial to be used against him at the second, even though he did not take the stand at the second trial.

■ Relying on the Green case,[4] Edmonds says he was twice put in jeopardy for the same offense. Under the doctrine of that case, the jury at the first trial, by finding Edmonds guilty of only second degree murder under the first degree count, impliedly found him not guilty of murder in the first degree. He reasons that, therefore, he could not be tried a second time under the first degree count, even for the included offense of second degree murder of which he had been previously convicted. His theory seems to be that after this court's reversal of his second degree conviction at the first trial, which expressly remanded the case for a new trial, he was immune from further prosecution for any offense included in the first degree count of the indictment.

The Green case does indeed hold that one whose conviction for second degree murder under a first degree indictment is reversed on appeal, cannot again be tried for murder in the first degree. But it does not go so far as to say he cannot be tried again for second degree murder. Indeed a contrary view may be said to be indicated. See, e. g. footnotes 10 and 11, 355 U.S. at page 190, 78 S.Ct. at page 225. In the present case, on remand after reversal, Edmonds was or-

**3.** See the annotation in 5 A.L.R.(2d) at p. 1408, in which cases to that effect from twenty jurisdictions are collected. See also United States v. Grunewald, D.C.S.D.N.Y.1958, 164 F.Supp. 644, which contains a thorough discussion of the subject supported by many authorities.

**4.** Green v. United States, 1957, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199.

dered to stand trial for second degree murder, as we have said. He was tried for that offense only. In these circumstances, we reject the argument that he has been subjected to double jeopardy.

■ With respect to his defense of insanity, Edmonds makes two suggestions of error. First, he complains that a police officer from Georgia, who had had experience in observing insane persons as he escorted them from his county to the State Mental Hospital, was permitted to testify on the basis of a short interview with Edmonds on November 26 that he—Edmonds—did not appear to be of unsound mind. As to that, it is enough to say the Georgia officer's testimony was admissible for whatever it may have been worth, regardless of the fact that it may have had a little probative value because he had observed Edmonds only a short time.

■ Appellant further claims it was error to permit Dr. Cushard, a psychiatrist introduced by the prosecution, to express the opinion that Edmonds was sane when the crime was committed. Appellant argues that he was committed to a mental institution under 18 U.S.C. § 4244 for a determination of his mental competency to stand trial, that Cushard's examinations were for that purpose, and that he should not have been allowed to testify concerning the appellant's mental condition at the time the crime was committed; and that receipt of Cushard's opinion violated § 4244.[5]

It might be argued that Edmonds was not committed under 18 U.S.C. § 4244, but rather under § 24–301, D.C.Code (1951), as amended August 9, 1955, 69 Stat. 609, ch. 673, § 1. It is immaterial whether the commitment was under the Federal or the District statute, because neither was violated. Dr. Cushard did not testify as to any statement made by Edmonds on the issue of guilt, and the judge's finding of mental competency to stand trial was not brought to the notice of the jury. It follows that neither statute barred Dr. Cushard's testimony expressing his opinion that Edmonds was sane when he committed the act.

■ Arguing further, Edmonds contends the trial judge erred in his instruction on flight in which he said to the jury:

"In this case, the Government contends that the defendant committed the acts charged and that he fled from the scene of the alleged crime. That is, as I said, a contention on the part of the Government. If you find that the defendant did flee from the scene, then you have a right to regard flight as an indication of consciousness of guilt, if you choose to do so, but it is a matter within your discretion."

With respect to this, appellant says in his brief:

" * * * The mere going away from the scene of a crime is not always flight in the sense that evidence is thus furnished of a consciousness of guilt. The appellant was not suspected of the crime, he was [not] under surveillance, he was not pursued, there was no one looking for him, in fact no one [knew] a crime was committed until more than a week had past [sic]. Thus, there would be no reason to conceal himself, or to avoid arrest."

Evidence of flight is competent as having a tendency to establish guilt. Allen

---

5. We reproduce the portion of 18 U.S.C. § 4244 to which Edmonds apparently refers:
" * * * No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury. Added Sept. 7, 1949, c. 535, § 1, 63 Stat. 686."

v. United States, 1896, 164 U.S. 492, 499, 17 S.Ct. 154, 41 L.Ed. 528; Green v. United States, 1958, 104 U.S.App.D.C. 23, 25, 259 F.2d 180. Edmonds admitted that, after he had strangled Lefebvre, he searched for and found the car keys and then took the decedent's car and went to Georgia; and that before leaving Lefebvre's apartment he used a cloth to avoid leaving fingerprints on the door knob. The jury could consider whether these actions indicated a consciousness of guilt.

 Finally, the appellant says reversible error occurred because a juror admitted having seen a newspaper account of the first trial. The juror said, however, that she had not been influenced by the article. Moreover, the trial judge carefully admonished the jury with respect to reading newspaper accounts of the proceedings. We find no prejudicial error on this score.

In sum, we hold the jury's verdict, reached after a fairly-conducted trial, must stand.

Affirmed.

EDGERTON and FAHY, Circuit Judges, concur in the result, and in the opinion except for the addition of the Appendix.

BAZELON and WASHINGTON, Circuit Judges, concur in the result.

### Appendix

Excerpts from the transcript of Edmonds' testimony at his first trial, given under direct and cross-examination.

Question: Turning your memory back to the early morning of the 18th of November, can you tell the jury what you did after you left the house of Henry T. Price?

Answer: Should I tell the whole story, sir, up until this moment, or what, sir?

Question: In your own words, begin with when you left Mr. Price's home.

Answer: It was around approximately 2:30 or 2:45 that I left Mr. Price's apartment house at 1845 Calvert Street, Northwest. I left there by foot, walking. I walked down about approximately a block and a half. I hailed a taxi. I told the driver to take me to 1247–31st Street, Northwest, to a lady I know named Emilia Parrish. I was going over to see her to spend the night there, because I was AWOL from the Marine Corps. It was 2:30 or 2:45 in the morning. I had intentions of going over there and sleep that night.

As I say, I was in a cab. The cab took me to 1845 Calvert Street, Northwest. I arrived there somewhere in the vicinity of, I would say, 3:00 a. m. on the 18th of November, 1956.

Upon arrival there, I knocked on the door of Emilia Parrish. Her father came to the door. I asked if Emilia was home. Her father stated she wasn't home as of that time. Upon that, I left 1845 Calvert Street, Northwest, walked around three-quarters of a block down to M Street, Northwest. I was standing on the corner of M Street and 31st Street, Northwest; that is in Georgetown.

Upon arrival at that corner, I had intentions of going back to the barracks and turning myself in as AWOL.

I had intentions of getting a cab as transportation back to the barracks. I was standing there waiting for a cab. One passed by, I hailed him by waiving [sic] my arm in this manner (indicating). The cab didn't stop, and as he drive [sic] past me I noticed he had passengers. I presumed that is why he didn't stop.

I stood there approximately five minutes more and I noticed this one car; it was a 1955 Chevrolet, red and white convertible. It starts driving up and down M Street past me. As he would pass me, he would look at me in the progress of passing by me. He did that on occasions of about three or four times, and then he drove up and down 31st Street looking at me in the same manner as he did as he drove up and down M Street. He drove down 31st Street, he parked on the corner of 31st and M

Streets, Northwest, parking his car on 31st Street.

He got out of the car and walked across Thirty-first [sic] Street and across M Street, past me and up the block. Approximately two or three minutes after he had passed me, I was suspicious of what the guy had in his mind to do or what he thought he would do.

I looked up the block toward him; he was standing up there facing me looking at me. At that time, when I looked at him, he walked back down to the corner to where I was, approximately two or three yards from me. I turned my back to him; still had intentions of getting a cab, going back to the barracks.

At that time the person walked over to me and stated, "Would you like a cup of coffee?"

At that time I said, "What is your angle, buddy?" and he, in return, says, "Nothing."

And then I stated, "Where are you going to get the coffee?"

He says, "Across the street in my apartment."

And at that time he started across the street and he told me to come on, and I did.

He walked across M Street, up M Street about a half a block. He turned to the left in this door, he went up one flight of stairs with me following him. At the top of the first flight of stairs he went over to the right towards a door, unlocked the door, went in. I followed him in. He went into what I would call a living room or a sitting room, turned on the light and told me to sit down and make yourself comfortable. That I did.

He stated then, "Do you like cream and sugar in your coffee?"

I said, "I do; I like both."

At that time the person went out of the room, I presume to fix the coffee. While he was out I noticed a radio on the table by the couch where I was sitting on. I turned the radio on and lit a cigarette. At that time the person came

back out from where he went to fix the coffee, he handed me my cup of coffee. I was sitting on a couch on one side of the room and he, after he had gave [sic] me the coffee, he sat on the couch on the other side of the room.

I started sipping upon the coffee, and I noticed books laying around the place. I said, "What is all the books for?"

He says, "Well, I try to go to school sometime."

And at that time he brought up that he had been in the service ten years and he had just been discharged recently.

And I finished my coffee and put my cup on the table beside the couch I was sitting on. I leaned back up against the back—there wasn't a back on the couch. I leaned back up against the wall in back of the couch, and closed my eyes for an instant.

At that time this person stated, "If you are tired, go ahead and lay down." And upon him saying that I got up and pulled off all of my clothes except my underwear, laid down on the couch, turned toward the wall and closed my eyes.

At that time I noticed the lights go out. I heard rumbling around in the room, such as a person would be walking around in the room, and then I felt something sit on the couch beside me.

I at that time turned over on my back, looked up and this person was sitting on the couch looking down at me in a wild sort of manner.

At the time I looked up at him he took his left hand, I think, placed it on my privates; with his right hand he came over towards me attempting to get it under my neck. At that time I pushed him away.

Immediately following that he did the same thing, he put his left hand on my privates, came over and attempted to get his hand under my neck the second time.

At that time I pushed him away, attempting to get up. I was in an unbalanced position getting up off the couch, and this person came back over onto me, pushing me back down onto the

couch, getting his right hand around my head in this manner (indicating) holding me. With his left hand he grabbed my privates.

At that time I grabbed him by his shoulders. I was on my back. This person was laying right on me—not in this manner (indicating) but right on me. I attempted to push him up and, as I would do that, he would tighten up around my head and make painful movements with my privates with his hand.

At that time I seemingly uncontrolled as it was lost my temper. [sic] I grabbed the man by his neck, gave a lunge, went over onto the floor, and after a few minutes, I would say—I am not sure exactly how long I held the man there, but it was over five minutes, I am pretty sure of that. At that time I turned the man aloose [sic], and he was completely motionless. I rested my hand on the couch in this manner (indicating); I gripped like that (indicating). I had a piece of cloth in my hand. I took that and put it around the person's neck and I thought I tied it in a half-knot position around this person's neck.

At that time I got up, looked at the person. He was motionless. At that time it came into my mind to go home to Georgia to my grandmother's place.

I had saw [sic] where this person had parked his car on Thirty-first and M Streets, a half block from where I was at that time. It came to my mind to take the car and go home to Georgia.

There was a closet in the same room I was in with this person on the floor; the door was open. I noticed some clothes hanging on this door. Oh, by the way, I turned the lights on as I stood up, after I tied the pillow case around this person, and I could see this pair of trousers hanging on this door. The color I don't know, but they were dark.

The intention was to get the car keys when I approached the trousers. I started searching and during searching for the keys for the car, I ran across a wallet. I took that wallet out of the trouser pocket, I opened it up and I took some bills out. It was a five and three or four ones.

I put that in my pocket and I continued to search until I found some keys. I looked at them, and I said to myself, "This must be the car keys."

At that time I went back out into where—out of the closet into the room where the person was laying on the floor. The radio was still playing at that time. I went to a couch that I—not the couch I was laying on, but the other couch. I pulled it out and unplugged the radio, put the radio under my arm, went into the bathroom, looked at myself, and wondered why I had did [sic] something like that.

At that time I went back into the room, looked at this person again, turned the light out, went out and down to where I had saw [sic] the person park the car.

The car, as I remember, was locked. I fumbled with the keys until I found the right one. I unlocked the car, I got in the car, I pitched the radio over into the back seat, I started the car up and drove directly to Falls Church, Virginia, as I think, or recollect. I purchased a tank of gas there and a quart of oil.

From there I drove to Charleston, West Virginia, to a person I know named Ruth Belcher.

\* \* \* \* \* \*

Question: When you were struggling with the decedent, the man who attacked you, were you afraid he might harm you in any way?

Answer: Well, sir, I had pushed this man away two times. The third time he attacked me and was holding me. I did have fear that the man might be, as what I have heard of, a maniac homosexual.

Question: Well, if he were, what harm could he do to you?

Answer: That I don't know. I was just scared; that is all I know, sir.

\* \* \* \* \* \*

Answer: How I was acting in self-defense, sir?

Question: Yes.

Answer: When the man made advances to me for the third time I got him off me or attempted to get him off me. He wouldn't go so I grabbed him around his neck and that is all I can remember, until I came about myself after he was motionless.

Question: You remember, then, clearly what happened from thereon [sic], do you not?

Answer: On occasions, yes.

Question: You were not in any danger while the man was motionless there on the floor, were you?

\* \* \* \* \* \*

Answer: No, sir. The man was lying still on the floor.

Question: You were not in any danger, then, at that time of serious bodily harm, or death, yourself, were you?

Answer: No, sir. I was not.

Question: It is at that time, then, that you reached over onto the bed and got this cloth, though, is that not so?

Answer: As I stated, I rested my hand on the couch like this. I grabbed—I had a piece of cloth in my hand. I don't [sic] know what it was until Detective Donahue told me it was a pink pillow case.

Question: At that time the man was motionless on the floor, was he not?

Answer: As I can recall. Yes.

Question: You were not blacked out at this time, were you?

Answer: No, sir. I was not.

Question: So what you did, then, was to take this cloth and wrap it around the person's neck?

Answer: That is correct.

Question: While he was helpless on the floor—

Answer: That is right.

Question: —you twisted it tight, did you not?

Answer: Like I said, I put it around his neck. I thought I put a half knot in it, but the evidence showed it was twisted like a garrote.

Question: What was your purpose in making it tight around his neck?

Answer: That I cannot explain. I do not know.

Question: You do not know what your purpose was in doing that?

Answer: That is right.

Question: How were you able to get it around his neck while he was lying on the floor?

Answer: Just put it under his neck..

Question: You picked his head up and put it under his neck?

Answer: I do not know, in detail. I remember I got under his neck and around his neck. That is all I can remember.

Question: Then after you pulled it tight you got up and turned on the lights?

Answer: That is right.

Question: You did not tie this around his neck or put it around his neck loosely, did you?

Answer: Like I said, I thought I tied it—from the way the thing showed, up it was twisted like a garrote.

Question: When you say you. "thought you tied it" you mean tied it lightly?

Answer: In a half knot.

Question: Tight around the neck?

Answer: That I do not know. What do you consider tight?

Question: Making an indentation in the neck?

Answer: That I do not remember. I do not know.

Question: Let me ask you this: When you turned the light on you had a chance, then, to look at the body on the floor, did you not?

Answer: When I turned the light on I stood right down [sic] at the person. That is right.

Question: You could see this object around his neck very clearly at that time, could you not?

Answer: I remember seeing it. Yes.

Question: Let me ask you this? Did you kneel down beside the body and attempt to remove this thing from around the neck that you had put there?

Answer: Did I kneel down?

Question: Yes.

Answer: No, sir.

Question: Did you make any effort to revive this individual on the floor?

Answer: I did not.

Question: Why?

Answer: What do you mean "revive"?

Question: Pardon?

Answer: What do you mean "revive"?

Question: You do not know what the word "revive" means?

Answer: Yes. I understand what the word "revive" means.

Question: What does it mean?

Answer: It means to take something that is—well, take a dog, or something, that has been run over by a car, and is laying motionless, dead or unconscious; or a drowned person. You take a drowned person and pump the water out of him.

Question: Did you make any effort with respect to this person on the floor to bring him to?

Answer: I did not.

Question: Why?

Answer: After the way the man had "did" me, sir; after the advances he had made; the way he had made them, I did not care what.

Question: You did not care?

Answer: No, sir.

Question: Even after you had gotten up and he was defenseless on the floor you did not care?

Answer: Why should I care?

Question: As a matter of fact, is it not true you have no regrets whatsoever about the actions of that particular morning in November?

Answer: As far as taking a man's life, yes, I do.

Question: When you first saw this man after he had gotten out of this car you made the statement this morning "I was suspicious of him." Do you recall making that statement this morning?

Answer: That is right.

Question: What did you mean by that?

Answer: A normal man, or normal stranger, in anyone's opinion, is not going to ride up and down a street looking at a person without some reason.

Question: So that you formulated the opinion, did you not, that while you were out in the public street that this man was not a normal person?

Answer: A stranger to me. Yes.

Question: Was it at that time that you suspected he was a "queer" or a homosexual?

Answer: Not at that time. No, sir.

\* \* \* \* \* \*

Question: Being suspicious of him you next said that he was above you on 31st Street where he had stopped and was just merely staring at you, and at that time you said you turned your back to him.

Answer: That is right.

\* \* \* \* \* \*

Question: \* \* \* I am talking about the time when you were resting; when you decided—when you took off your clothes and decided to rest. What was your position at that time?

Answer: I was laying on my right side.

Question: Facing the wall?

Answer: Facing the wall.

Question: Were the lights on or off at this time?

Answer: They were on part of the time, until—I stated I laid there a couple of minutes and noticed the light go out.

Question: You already suspected at that time this man was a homosexual, did you not?

Answer: I did not know for definite.

Question: You did not know definitely, but you suspected it, did you not?

Answer: I had, maybe, a slight idea. That is right.

Question: Before you took your clothes off you had that slight idea, did you not?

Answer: That is right.

Question: Have you ever known any other people that were that way?

Answer: Had I ever known any other homosexuals?

Question: Yes.

Answer: I talked to them. Yes.

Question: Did they have the reputation of being an "easy target"?

Answer: Would you explain "easy target"?

Question: To get things out of them; money, cars, things; things of that type.

Answer: I have borrowed money, I have borrowed cars from people of that sort.

\* \* \* \* \* \*

Question: By the way, when the deceased first came there to you at the sofa, you say he put his hands on your privates; that was in a friendly manner, was it not?

Answer: I do not call that a friendly manner.

Question: He did not try to hurt you there, did he?

Answer: At that time, no, sir.

Question: What did you do at that first instant?

Answer: With my two hands I pushed him back.

Question: Did you do it with your two hands or your elbow?

Answer: With my two hands.

\* \* \* \* \* \*

Question: But you did use some piece of cloth or material to put on the door handle when you opened the door to go out of the apartment?

Answer: That is right, sir.

Question: And when you got out of the apartment you did likewise to close the door, use a piece of material?

Answer: That is correct, sir.

Question: You didn't have any gloves on at that time, did you?

Answer: No, sir, I didn't.

Question: And your purpose in doing that was what?

Answer: I am sorry, sir. I can't explain it. I don't know why. I mean, there is no special purpose, I don't guess, unless the logical reason I can say is to keep fingerprints off the door handle.

Question: You knew about fingerprints then at that time, did you not?

Answer: I did, sir.

Question: And did you make any effort inside the room to wipe off any fingerprints?

Answer: I did not, sir.

Question: Now, you did pick up your belongings, though, including your lighter, cigarette lighter, and took everything that belonged to you?

Answer: My cigarettes and cigarette lighter was laying on a table also with a cup that I drank coffee out of.

\* \* \* \* \* \*

Question: Did the deceased give you permission to take those keys out of his pants pocket?

Answer: No, sir, he did not.

Question: Did he give you permission to take the money out of his wallet?

Answer: No, sir, he did not.

Question: The radio, to unplug it?

Answer: No, sir.

Question: Did he authorize you to use his automobile or tell you you could take the automobile?

Answer: No, sir.