UNITED STATES of America

v.

Anthony V. VECCHIARELLO, Appellant.

UNITED STATES of America

v.

Louis P. VECCHIARELLO, Appellant.

Nos. 76–1920 and 76–1921.

United States Court of Appeals,
District of Columbia Circuit.

Nov. 29, 1977.

As Amended Dec. 13, 1977.

Rehearing Denied Dec. 21, 1977.

Anthony V. Vecchiarello and Louis P. Vecchiarello, appellants, pro se.

Earl J. Silbert, U. S. Atty., and John A. Terry, William D. Pease and Richard H. Saltsman, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before McGOWAN and MacKINNON, Circuit Judges, and McMILLAN,* United States District Judge for the Western District of North Carolina.

Opinion for the court filed by MacKINNON, Circuit Judge.

MacKINNON, Circuit Judge:

Anthony V. Vecchiarello, Louis P. Vecchiarello, and Marino J. Maturo were jointly indicted in criminal case No. 1981–69 on December 23, 1969 for numerous counts of wire and mail fraud and uttering forged documents. The offenses revolved around an alleged scheme and artifice to defraud certain named medical patients who were induced to patronize appellants believing

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

them to be properly trained physicians duly licensed to practice in the District of Columbia, whereas in truth and in fact they were not properly trained or licensed. All three appellants were jointly tried and convicted, and they subsequently appealed their respective judgments of conviction.

On the first appeal, this court affirmed all the convictions by order and a *per curiam* opinion. *United States v. Vecchiarello, et al.*, Nos. 24,723, 24,725, 24,776, decided November 22, 1971. Thereafter each appellant moved under 28 U.S.C. § 2255 to vacate his sentence and from a denial of such motions they filed another appeal. In our decision thereon, we disposed of a number of appellants' arguments adversely to their contentions, but we did remand the case to the District Court to consider three of their claims. *United States v. Vecchiarello*, 175 U.S.App.D.C. 393, 536 F.2d 420 (1976); *United States v. Maturo*, 175 U.S.App.D.C. 400, 536 F.2d 427 (1976).

It is the record on the remand of these three separate appeals that is now before the court in Nos. 76–1920, 76–1921, and 76–1741 entitled *United States v. Anthony V. Vecchiarello, United States v. Louis P. Vecchiarello*, and *United States v. Marino J. Maturo*, 187 U.S.App.D.C. ——, 569 F.2d 666, respectively. While the relevant facts involving each of the three appellants vary in some minor details, and the composition of the division of this court that heard *Maturo* did not include two judges who participated in this decision involving Anthony and Louis Vecchiarello; at the request of all three appellants, we have generally considered all issues raised by the

separate appeals as being raised by all appellants.[1] In compliance with appellants' request, we now proceed to consider the contentions of all three appellants even though the judgment following this opinion applies only to Nos. 24,723 and 24,725 involving Anthony V. Vecchiarello and Louis P. Vecchiarello, respectively. In doing so, we have considered the case on the transcript, record, and briefs without oral argument in accordance with Rule 11(e) of this Court.[2]

## I. DID THE PROSECUTOR KNOWINGLY USE PERJURED TESTIMONY AND THREATEN WITNESSES?

 This claim, while appearing to involve two separate claims of perjury and intimidation of witnesses, actually amounts to a single contention—that the United States Attorney threatened witnesses to testify falsely.

### A. The Witness Fabianich.

Anthony Fabianich is the first witness that appellants claim was coerced into testifying falsely. However, Fabianich was not produced as a witness. In his absence, the court permitted the introduction of a post-trial affidavit dated the 9th day of February, 1975. This affidavit (Dfts. Ex. 4) referred to a "Citizen's Voucher" he had signed on behalf of Anthony Vecchiarello, who was then using the name "Dr. Anthony DeRuosa" (Tr. I, 337–338). Appellants, in argument, referred to paragraph 6 of the Fabianich affidavit which stated:

> should the principal be successful in his appeal. . . .

Appellants' Brief p. 61.

1. Appellants' joint brief filed by all three appellants *pro se*, on their "Joint Appeal from the United States District Court for the District of Columbia Circuit" makes the following request:

 It is respectfully submitted that this Court permit its findings to apply to all appellants to the same extent as if such appellant separately raised the combined specific issues herein. The three criminal cases have made each appellant responsible, as a conspirator, for the acts of each other as inseparable defendants. It is to be noted that a conspirator is liable to the same extent as the principal. Then, by the same reasoning process each co-conspirator should fare no less [well]

2. Rule 11(e) provides:

 (e) Whenever the court, sua sponte or on suggestion of a party, concludes that a case is of such a character as not to justify oral argument, it may, after causing notice to be given by the Clerk to the parties of that determination, proceed to dispose of the case without such argument.

 Motions for restoration to the argument calendar will not ordinarily be entertained by the court.

"I related to him that I was semi-retired but did own stocks and real estate plus deriving an income from rents and promissory notes. Mr. Glanzer, during both meetings with him at his offices, refused to accept such statements as true and used language relating to me that if I did not testify before the Grand Jury and trial of Anthony Vecchiarello that such statements were false and not authorized by me he would send me to jail along with Anthony Vecchiarello and he would have my brother's, Joseph Fabianich, parole violated and send him back to jail."

Then turning to the second page, paragraph 10:

"During the trial I testified not to all true statements, but to some statements that Mr. Glanzer wanted me to say, even though false. I did this because of Mr. Glanzer's continued threats to me recited in paragraph 6 of this affidavit."

(Tr. July 15, 1976, 192–193).

These portions of the affidavit are deficient for appellants' purposes in that they do not identify any particular portions of Fabianich's testimony as being false. And given both the failure of Fabianich to appear at the hearing and the complete refusal of all other witnesses for appellant to substantiate appellants' similarly raised claims of perjury, adequate grounds existed for the hearing judge's refusal to credit appellants' claim in this respect.

Also, placing significance on Fabianich's "semi-retired" status while owning "stock and real estate plus deriving an income from rents and promissory notes" seems relatively minor. This statement was apparently intended to refer to the trial testimony of Fabianich (Tr. 337) that he had not set forth on the "Citizen's Voucher" that he was an "investment Counsellor," when he was not "an investment counsellor at that time." Obviously the fact that Fabianich did not own "stocks and real estate [and derive] income from rents and promissory notes" did not mean that he still could not be an "Investment Counsellor."

Also involved on the voucher was the following statement:

I hereby certify that since 1965 I have been so closely associated with Dr. Anthony DeRuosa residing in *Julisco*, Mexico, and Paterson, New Jersey . . . I certify further that to my personal knowledge he has been *actively* [emphasis in original] engaged in the practice of medicine for not less than one *continuous* year out of the three years immediately preceding the date of this application. (Emphasis added).

(Tr. 338). Fabianich testified that this statement was false and that he did not authorize it to be put there. (*Id.*) (Hearing Tr. 193–194).

But more important than such claims is the importance of ascertaining the nature of "threats" that were allegedly made by the U.S. Attorney in order to induce the resulting testimony. Since this same subject was covered on cross-examination at the trial in the absence of the witness, we are required to turn to that transcript. There we find that the statements made by the U.S. Attorney, that Fabianich considered threatening, were:

Well, *he wanted . . . [t]o get the dates straight . . .* I had the feeling that he was threatening me, that *if I didn't do things right,* why I would be sitting in jail with them . . . *I better tell them what I knew . . .* after that he said, Well, it's a good thing you are telling the truth . . . Q. As you sat here on the stand facing the Court and this jury, was every answer that you gave here in this courtroom today to the questions that were asked, the truth? A. Yes, Sir. (Tr. 340–341, 356).

Fabianich previously testified:

Q. Did the [United States Attorney] at any time suggest any answer?

A. No, sir.

Q. Are you sure?

A. Pardon?

Q. Are you sure?

A. Yes, sir.

(Tr. 340). Thereafter on redirect examination Fabianich testified in response to interrogation by the United States Attorney:

Q. And you felt threatened when you were with me, is that correct?

A. Yes.

Q. And did I tell you to tell the truth?

A. Yes, sir.

Q. And that is what you mean by threatened?

A. Well, no, not that.

Q. Did I tell you to tell the truth?

A. Yes, sir, and you said that what you found out, it was the truth I was telling.

Q. That was afterwards, is that right?

A. Yes, sir.

(Tr. 356–357).

Q. Did anyone tell you [in the Grand Jury] what to say?

A. No, sir.

Q. In this courtroom today?

A. No, sir.

(Tr. 359).

It thus appears that the U.S. Attorney did not suggest any answers, never told the witness "what to say," and what Fabianich considered as "threats" were statements by the U.S. Attorney that he should testify "straight," "do things right," and "tell them what I knew." Directing the attention of a potential witness to the requirements of the law and its consequences if they testify falsely is perfectly proper. Such statements to a truthful witness are not threatening. If a witness who may desire to testify falsely to support a friend feels threatened by such statements, that is the result of an original improper motivation on his part, and is not the result of an improper threat. The threat eventuates from the penalties prescribed by the perjury, etc., statute and they are intended to be coercive—to compel "the truth, the whole truth and nothing but the truth," as the oath of a witness prescribes.

The foregoing sets forth our analysis of the factual record, and it does not support appellants' claim on this point. Moreover, we note in reading the transcript that there were any number of other available witnesses who were disinterested that could have been available to support appellants'

claims, insofar as they were *not* supported by Fabianich's trial testimony, had appellants' contrary claims been truthful. That such witnesses were never produced, or even claimed to exist, is fatal to appellants' claims.

**B. The Witness Vance.**

The claims with respect to Vance are typical of the remaining claims. Vance was a park police officer in Maryland whose signature appears on an affidavit prepared by appellants' attorneys in their attempts to support appellants' contention that there had been improper wiretapping of their office telephone. Vance, a patient of appellants', while using the office telephone, thought he heard a "chime" and so informed appellants. Later, the attorneys for the defendants in the affidavit included a statement whereby Vance represented that he was "generally familiar with techniques and methods of telephone wiretapping." (Tr. 50). This was obviously intended to add strength to Vance's wholly speculative assertion that appellant's telephone line was tapped. However, at the hearing, Vance testified that such was "not a true statement" and that he had "pointed . . . out to the Notary Public that it wasn't true." He signed the affidavit, he said, because he thought "the main thing . . . was that I heard the chimes." (Tr. 50). On cross-examination of Vance by Anthony Vecchiarello acting *pro se*, the following testimony was adduced:

[Vance] The time I signed that I pointed out the discrepancies to the Notary Public. At that time I thought that he would make note or change whatever I pointed out to him. I did not know about legal documents, the way they are set up now and exact wording had to be in the affidavit, so therefore, half of that affidavit which your [Anthony Vecchiarello's] attorneys made up is untrue.

THE COURT: Who actually made up this affidavit?

THE WITNESS: Dr. Maturo and Vecchiarello's attorneys, they gave it to me to sign.

THE COURT: In other words, they made the affidavit and just gave it to you to sign, and you told them that it was not correct?

THE WITNESS: Yes, sir.

(Tr. 59–60). So the truth of the matter was that Vance was "not [as] . . . familiar with wiretapping techniques" as the affidavit had represented. The actions of the U.S. Attorney when he discussed Vance's affidavit with him, questioned it, took Vance before the Grand Jury, and "told [him] to tell the truth," were perfectly legitimate and were not improper threats or coercion. Vance admitted he was *"not"* "as qualified as [he had] stated." (Tr. 60). And his qualifications in that respect went to the very heart of his testimony.

Nevertheless, in the face of this, Anthony Vecchiarello, a disbarred attorney, who handled the remand *pro se* and for appellants, persists in arguing that the United States Attorney in an "unauthorized and illegal" manner influenced Vance to "withdraw and retract or recant the affidavit" (Tr. 195–196). We disagree. We find that the U.S. Attorney acted in an authorized and proper method.

C. The Witness Edelen.

Audrey Edelen was a witness for appellants at the hearing who also signed a prior affidavit. She had been treated as a patient by Maturo. Through her testimony, appellants sought to support the claim of wiretapping. She testified that when the U.S. Attorney interrogated her, "he told me he had records of several calls that I had made to that office, and he gave me the times . . . and dates of some of them" (Tr. 42–43). From this appellants argued that the records must have resulted from illegal wiretapping of their telephones. However, no testimony was adduced as to any wiretapping, and all alleged wiretapping was categorically denied by the United States Attorney (Tr. 155). He did not recall the precise source of her telephone calls to which he had referred. It was the Government's "standard operating procedure" in criminal cases to issue subpoenas for "telephone toll calls" (Tr. 156–157). He also thought it probable that "we got her name from laboratories where the defendants submitted tests . . . ." (Tr. 157). More in keeping with the information referred to, however, is the possibility that they were recorded as long distance calls from Edelen's home at "Route 2, Box 2362–C, LaPlata, Maryland" (Tr. 39) some miles from Washington, D.C. In any event, the Edelen testimony is not fully supportive of wiretapping, no other creditable evidence supports such accusation, and the flat denial of all said activity by the U.S. Attorney clearly outweighs appellants' claim.

We close this phase of the discussion by noticing that there is nothing in the testimony of the witness "Joseph Sarnella, . . . Chief of the [D.C.] License Bureau" and the comments of appellants' counsel with respect thereto, that even remotely resembles any improper conduct by the prosecution.

## II. DID THE PROSECUTOR USE ILLEGAL WIRETAP EVIDENCE?

■ We answer this question in the negative. Appellants argued this point in connection with their claims of improper coercion of their "wiretap" witnesses. Our foregoing discussion of their testimony and the prosecutor's reply thereto is sufficient to support the trial court's finding that appellants' contentions in this regard should be denied.

## III. DID THE TRIAL JUDGE ATTEMPT TO COERCE ATTORNEY LEROY NESBITT?

■ Attorneys Nesbitt and Chaikin represented appellants *after* the jury returned its verdict on June 16, 1970. They are listed in the docket entries as appearing on June 30, 1970 in support of appellants' Motion for a New Trial and on October 15, 1970 at sentencing when the trial attorneys were granted leave to withdraw. The actual notices of appeal in all three cases were dated October 15, 1970 and were filed by "Leroy Nesbitt and Donald J. Chaikin" (R. 66, 67, 68). The charge that the judge attempted to coerce Mr. Nesbitt in some

way was made in a motion for relief under 28 U.S.C. § 2255 by Mr. Louis Vecchiarello. It alleged:

"The trial Judge on July 17, 1970, and before the defendant was sentenced (October 15, 1970) attempted to obstruct defendant's right to counsel of his own choosing when he informed one Leroy Nesbitt not to represent defendant. The Judge related to Mr. Nesbitt that defendant had no funds to pay counsel fees and further that if Mr. Nesbitt persisted in representing the defendant, then he, the trial Judge, would remove his political backing of Mr. Nesbitt for a judgeship in the District of Columbia."

(Tr. 168). Later *in briefs* filed in this court in case Nos. 24,723, 24,724 and 24,725, *United States v. Maturo, Louis P. Vecchiarello, et al.*, with Messrs. Nesbitt and Chaikin as counsel of record, the following appears:

"The trial Judge sought to dissuade co-counsel from representing the appellants with the statements that no future political backing would be accorded counsel and that he would not be paid by the defendants. (See the minutes.)"

(Tr. 169, Dfts. Ex. 1, p. 4). The co-counsel referred to was stated to be Leroy Nesbitt and the statement of the judge was allegedly made in the presence of Messrs. Nesbitt, Chaikin, and the United States Attorneys, Messrs. Gene Anderson and (possibly) Seymour Glanzer.

At the remand hearing, the judge and Mr. Glanzer denied that any such statement was made (Tr. 164–165, 158, 160–161). The gist of appellants' statements as to the source of this allegation was that it came from their attorneys Nesbitt and Chaikin (Tr. 172–177, 179–182, 184–187). The testimony of Louis Vecchiarello (Tr. 184–187) is very strong that Nesbitt and Chaikin were the source to them of the allegation.

Yet, despite the foregoing testimony, and the appearance of the charge in the pleadings and brief, both Nesbitt and Chaikin disclaim that such threats ever occurred and that they were responsible therefor. Nesbitt testified that he and Chaikin prepared the brief. (Tr. 21–22). As to the charge against the trial judge, Nesbitt testified, "No, I did not [make such a statement]." (Tr. 22). He did "not recall that . . . in a conference with [the] Judge . . . that he in any way suggested that you should not proceed representing the defendants here . . . it did not happen . . . I have never been intimidated by any judge in any court, and have never been asked by any judge to withdraw from a case." (Tr. 25). Chaikin testified: "I specifically don't remember if I prepared this statement of facts [alleging the threat by the judge]" (Tr. 12). " . . . I do not recall [such statement]" (Tr. 13). "I have no independent recollection of this [statement]" (Tr. 14). "That's correct . . . [I] have no recollection of any threats or intimidation" (Tr. 16). This was repeated at Tr. 19 in response to a question by the presiding judge.

It thus appears that no person substantiates the charge that the statement was ever actually made, and all those present at the alleged time deny that it was made.[3] There is thus no basis to support this charge. Nevertheless, Vecchiarello argued to the hearing judge that there was nothing to "preclude that such a thing did or did not happen" (Tr. 208). In the absence of any supporting evidence, we find to the contrary.[4]

## IV. MISCELLANEOUS CLAIMS.

The foregoing disposes of all the claims we remanded to the district court. How-

---

3. Former U.S. Attorney Gene Anderson was not available for interrogation.

4. In this point appellants still contend there is something to their claims that the judge was biased against them because he threatened Nesbitt, even though there is no supporting evidence of that allegation. However, appellants next argue, inconsistently with their first claim, that the allegation that Nesbitt was

threatened is false, that their lawyers were responsible for it and that the lawyers used it as a ploy to get a fee out of them for writing an appellate brief. We do not decide whether appellants can recover the fees they paid their appellate counsel. The conduct of the appellate lawyers is pending before the appropriate committee of the Bar and we elect to leave it there.

ever, during the hearing appellants sought to raise several issues that had been raised and denied on former appeals. One or two other prior contentions have been given a new twist. We discuss them briefly.

### A. Inadequate Assistance of Counsel.

■ As with most criminal appeals these days, appellants claim they did not receive the effective assistance of trial counsel who were different from appellate counsel. They contend counsel did not represent them on motions as they stated they did (Tr. 199) and that they did not adequately prepare or conduct their defense. In considering these claims, it should always be recognized that all counsel were retained and paid by appellants. Also Anthony Vecchiarello was a disbarred lawyer and apparently not ignorant of court proceedings though some of his claims here have been obviously devoid of supporting evidence.

As to the motions, the court file record and the docket entries show that a single lawyer was originally retained on January 22, 1970 and that the lawyers whom appellants claim did not file the motions they said they did were joined as counsel on February 4, 1970 and May 28, 1970. The latter two lawyers tried the case. The lawyer who first joined original counsel was listed as co-counsel on the Motion for a Bill of Particulars on February 27, 1970. Thereafter three motions were filed before the third counsel was appointed. Thereafter he appeared on May 28, 1970 on the renewal of the motion for (1) trial continuance, and (2) to dismiss and (3) to sever. On June 4, 1970 the two trial counsel (without initial counsel) appeared on the argument for severance and for dismissal. Original counsel withdrew on June 8, 1970 when the trial started.

It thus appears that appellants were incorrect in their complaints about "motions."

As for the conduct of the trial the claims are numerous. Appellants attack counsel's preparation in numerous aspects, that they did not object to inadmissible testimony, and that they failed to put in any witness or to present any defense.

The claim concerning the admission of inadmissible testimony centers chiefly around Dr. Humberto Castro who testified with respect to activities in the medical school at the University of Yucatan, Mexico. Appellants claim that Dr. Castro was not the person he represented himself to be and that some undisclosed Jencks Act material would have so proved. The claim as to his lack of bona fides was based, as most of appellants' arguments were, on a partial consideration of a fact, i. e., Dfts. Ex. 5, at the hearing. The claim was that the reference on this exhibit to the results of an examination implicitly showed that Dr. Castro was not a doctor, and that he could not have been the Dr. Castro from Yucatan because the exhibit indicated he was in Washington, D.C., when he testified he was in Yucatan. Not so. The exhibit indicated that a subsequent test examination was scheduled, that his pay was raised shortly after the earlier date, and that he continued as a Resident until 5/13/62 or possibly 7/1/62. This was not inconsistent with his testimony that he returned to Yucatan thereafter, became Secretary to the Medical School in September, 1965, and was presently occupying that position (Tr. June 10, 1970, 501). As for the Jencks Act claim that was disposed of in our prior opinion, it suffices to say that appellants did not demonstrate the existence of any such Jencks Act material as they requested. Their reasoning in this respect is far-fetched.

As to the conduct of the trial by the defense lawyers, it should be noted that the trial began on June 4, 1970 and continued until June 16, 1970. Appellants were represented by two very experienced criminal trial lawyers. Their conduct of the actual trial demonstrates their experience. One counsel was from the District of Columbia. He is a member of the Indiana and D.C. Bars and has practiced here since 1958 (Tr. 109, 133). In 1970 when this trial occurred, he had acted as counsel in "hundreds . . . of criminal trials." "I had 100 felonies going at one time in this Court under the Criminal Justice Act" (Tr. 133). The other lawyer from New York was not called as a

witness by appellants. He carried the laboring oar at trial. He had also, prior to the criminal trial, *successfully* represented appellants in a Civil Action in the District Court which sought an injunction against their continuing to practice medicine. That case involved some of the facts that were subsequently in issue in appellants' criminal trials. The Court decided that the injunction would not be granted until a further time (Tr. 832). Appellants do not single out this lawyer for any special condemnation.

Naturally appellants claim their lawyers did not adequately prepare the case, but, recognizing the kind of a case that they had, the proof is to the contrary. The lawyers obtained full discovery from the Government (Tr. 117, 119, 122) and thoroughly interviewed all the defendants on all phases of the case and on all possible theories of any affirmative defense (Tr. 117). They spent two entire weekends cooped up with all appellants in a hotel room completely canvassing the evidence and issues in the case. They discussed potential witnesses with appellants (Tr. 121) and they were given a list of numerous character witnesses.

In the last analysis the lawyers made a decision "tactically" not to offer any witnesses and not to put the defendants on the stand. Some of the defendants wanted to pursue a different course (Tr. 119). Counsel considered that their only "affirmative defense was themselves" (Tr. 135) but "because of previous activities [they] didn't think any of you [defendants] should take the stand and that was a tactical decision that was made." (Tr. 118). They also decided against calling any character witnesses "who didn't know [the] full backgrounds [of appellants]." (Tr. 121). They considered such witnesses could not be beneficial because they would be cross-examined on defendants' "past activities" and that would be devastating (Tr. 130). If the defendants took the stand they concluded from their interviews that they would be "impeached by other crimes . . . and by other locations . . . they might have been some place else when they were supposed to be in [medical] school" (Tr.

136). "Mr. Vecchiarello, [which one was not stated] was in fact incarcerated during one period when he was allegedly in school in Mexico . . . [and] Mr. Maturo was [incarcerated] in Florida" (Tr. 136). Defendants' counsel successfully kept the testimony as to their incarceration from the jury (Tr. 136).

With such facts facing them, defense counsel advised defendants that they would not put them on the stand as witnesses and the defendants "just went along with us [counsel]" (Tr. 142). Thereafter, counsel prepared "a full defense" and put it in "by cross-examining Government witnesses and oral motions in court, and by objections and deciding not to put the defendants on the stand" (Tr. 141). As in many criminal cases, particularly where some defendants have prior criminal records, the best and only defense in counsel's judgment is to put the Government strictly to its proof and to argue that the high burden of proof was not satisfied by the evidence. We see nothing improper in such handling of this case. Had appellants taken the stand, it would appear that any testimony that was exculpatory would have added perjury to their offenses, which would have justified a more severe sentence than the reduced sentence the trial judge eventually imposed. It was counsel's judgment that they "should have the plea bargained [and probably] could remain on the street . . . but [Anthony] Vecchiarello definitely wanted to go to trial in this matter" (Tr. 134–135). It thus appears that he, and his co-defendants, would have been well advised to accept the advice of counsel who had very considerable experience in criminal trials.

### B. The Introduction of Depositions From a Civil Trial.

█ *Pro se* counsel persists in the claim that it was improper to allow the introduction of some depositions from a *civil* trial in Maryland. The case was "Civil Action No. 20001, *Vecchiarello & Maturo v. Eisner*, U.S. District Court for the District of Maryland, Rockville, Maryland, October 27, 1969" (Tr. 689). There were depositions of Matu-

ro (Tr. 689–697) and L. P. [Luigi Peter] Vecchiarello (Tr. 697–700). These depositions tended generally to prove that both men admitted they could not recall the names of the professors in the medical subjects they allegedly took at the Universities of Guadalajara and Yucatan respectively. Also, Maturo generally could not remember what courses he took in medical school or the name of the textbook used. Nor could he remember any person he lived with while allegedly attending school there or "the names of any students who started out in [his] class" (Tr. 696). He was also unable to translate his diploma which was in Spanish, though the examinations at the medical college were *all* in Spanish (Tr. 696–697). Counsel contends that the introduction of such depositions violated (1) the deponent's Fifth Amendment guarantee against self-incrimination, (2) their right not to have their character attacked when they had not placed their character in issue, and (3) their *Miranda* rights. Such contentions are all groundless.

The Fifth Amendment is based on the ancient maxim that no man is bound to accuse himself. It protects one's personal privacy from unwarranted intrusion. *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 415, 416, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). Had Maturo or Vecchiarello wanted to claim their privilege in the civil trial, they should have done so. When they failed to do so their testimony is in the public domain. Likewise, there was no violation of the decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* prohibits police interrogation, without proper warning, *i. e.*, "custodial interrogation . . . questioning initiated *by law enforcement officers after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added). The depositions used here were taken on October 27, 1969 before a Special Master by the lawyers for the defendant in the civil action. No "police interrogation" was involved. The depositions do not constitute "custodial interrogation." Maturo and L. Vecchiarello

were present when the deposition was taken, they were represented by counsel throughout, and they did not object to the interrogation. This is significant because when a prior deposition of the same parties was taken in the same civil case on July 18, 1969, with the same lawyers appearing for the two deponents as those who appeared for them at the October 27, 1969 deposition, the defendants, through their counsel, did frequently claim their privilege against self-incrimination when they were asked questions along similar lines directed at verifying whether they had the medical training necessary to qualify as medical practitioners. Under such circumstances, the failure to claim their Fifth Amendment rights at the second deposition, part of which was read at their criminal trial, cannot be treated as other than a voluntary, knowing waiver.

The claim that the admission of the deposition material constituted an impermissible attack on the character of appellants, since they had not placed their character in issue by taking the witness stand in the criminal trial, misconstrues that rule and the ground upon which the depositions were admitted into evidence.

The depositions were admitted because they constituted substantive evidence on a principal issue in the case: that the defendants had committed the fraudulent acts with which they were charged by holding themselves out as duly qualified medical doctors, with M.D. degrees, when they were not. That the sworn testimony of Maturo and Louis Vecchiarello in the depositions was probative of such charges qualified the depositions for admission, and the fact that secondarily such proof of illegal and fraudulent conduct by the defendants would tend to disparage their character does not deprive the evidence of its admissible character. Actually, all proof of illegal conduct tends to disparage the character of individuals, if they were previously considered to have good character. Such evidence generally is admissible if it satisfies any of the many valid grounds for admission. This is the rule of multiple admissibility. It is a

fundamental rule and we believe it applies to the facts of this case. Professor Wigmore states the rule to be as follows:

> [W]hen an evidentiary fact is offered for one purpose, and becomes admissible by satisfying all the rules applicable to it in that capacity, it is not inadmissible because it does not satisfy the rules applicable to it in some other capacity and because the jury might consider it in the other capacity.

J. Wigmore, Evidence § 13, p. 300 (3d ed. 1940) (emphasis in original). Like all rules, there are exceptions and qualifications to this rule; but we find none that are applicable here.

At the time this case was tried in June, 1970, the admission of evidence in a criminal trial was governed by Fed.R.Crim.P. 26. This Rule provided:

Rule 26. *Evidence* . . . . The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed.R.Crim.P. 26, as amended to July 1, 1968; 18 U.S.C. p. 3756 (1964 ed.).[5] Applying this rule to the evidence in the instant case leads to the conclusion that the portions of the sworn depositions of Louis P. Vecchiarello and Maturo[6] that were here introduced constituted admissions against interest, and, as such, were properly admitted as substantive evidence.[7]

We have also considered all the other minor points raised by appellants and find

---

**5.** Fed.R.Crim.P. 15 was not applicable as it related only to depositions of witnesses who were not parties in the criminal case. Even that rule, however, permitted use of such evidence if "the party offering the deposition has been unable to procure the attendance of the witness by subpoena." Fed.R.Crim.P. 15(e), 18 U.S.C. p. 3756 (1964 ed.).

**6.** Both depositions bear the notation at the end thereof: (By stipulation of counsel, with the consent of the witness, reading and signature waived.)

**7.** *Hall v. United States*, 406 F.2d 476, 478–479 (10th Cir. 1969) (statements made by the defendant in an affidavit filed in a prior civil contempt proceeding, and his oral testimony therein, were held admissions against interest and properly admissible in a subsequent criminal prosecution against the party who made them, citing the following cases: *United States v. Castellana*, 349 F.2d 264, 274 (2d Cir. 1965) (deposition of bankrupt in prior related civil proceeding held admissible in criminal case charging violation of the federal bankruptcy fraud statute); *Pollock v. United States*, 202 F.2d 281, 284–285 (5th Cir. 1953) (written examination of taxpayer taken under oath by Internal Revenue Agents held to be probative of guilt and admissible in evidence in criminal tax evasion case); *Ayres v. United States*, 193 F.2d 739 (5th Cir. 1952) (sworn testimony in a civil proceeding attacking the legality of plaintiff's induction into service in which he admitted signing another's name to a letter held to be an admission that was admissible in a criminal proceeding for making a false, forged, and counterfeited letter)). We also held in *Edmonds v. United States*, 106 U.S.App.D.C. 373,

377–378, 273 F.2d 108, 112–13 (1959) that a defendant in a criminal case who takes the stand in his own behalf and testifies without asserting his privilege against self-incrimination waives the privilege as to the testimony given; thus, the testimony may be used against him in a subsequent trial of the same case even though the defendant did not take the stand at the second trial. And *Milton v. United States*, 71 App.D.C. 394, 110 F.2d 556 (1940) is authority for the proposition that sworn statements against interest in a prior criminal trial are admissible as admissions. *See also*, Orfield, 4 Criminal Procedure Under the Federal Rules 337, § 26:755 (1967); Wharton, 3 Criminal Evidence 496, § 694 (1973). The present Fed.R. Crim.P. provides in Rule 15(e):

> (e) Use. At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used as substantive evidence if the witness is unavailable, as unavailability is defined in Rule 804(a) of the Federal Rules of Evidence, or the witness gives testimony at the trial or hearing inconsistent with his deposition. Any deposition may also be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness. If only a part of a deposition is offered in evidence by a party, an adverse party may require him to offer all of it which is relevant to the part offered and any party may offer other parts.

Rule 804(a) of the Federal Rules of Evidence defines "unavailability as a witness" to include one "exempted by ruling of the court on the ground of *privilege* from testifying concerning the subject matter of his statement . . . ."

them all to be insubstantial. In general, appellants' claims are completely frivolous and not based on sound theory or proven fact.

## CONCLUSION

For the reasons heretofore stated, we conclude that the findings of the trial court (Tr. 230–232) are all supported by substantial evidence and that none are clearly erroneous. Therefore, we affirm its judgment in Nos. 76–1920 and 76–1921 against Anthony V. Vecchiarello and Louis P. Vecchiarello respectively.

*Judgment accordingly.*