Dale Estin **BIRDSELL**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 21649.

United States Court of Appeals Fifth Circuit.

May 17, 1965.

Rehearing Denied July 8, 1965.

O. Don Chapoton, Houston, Tex., for appellant.

Harry Lee Hudspeth, Asst. U. S. Atty., Ernest Morgan, U. S. Atty., San Antonio, Tex., for appellee.

Before TUTTLE, Chief Judge, and BROWN and FRIENDLY,* Circuit Judges.

* Of the Second Circuit, sitting by designation.

FRIENDLY, Circuit Judge.

Dale Estin Birdsell appeals, in forma pauperis and with the aid of assigned counsel, from a conviction, after a jury trial in the District Court for the Western District of Texas, for a conspiracy to transport stolen automobiles from the United States to Mexico and for the transportation of a particular stolen vehicle, 18 U.S.C. §§ 371, 2312. There was overwhelming evidence that Birdsell— along with three other men, Dow, who pleaded guilty, Callender, who was convicted and whose appeal has been dismissed at his request, and McDaniel who was charged under the Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5037 —had engaged in an enterprise whereby a number of automobiles stolen in the United States were spirited across the border for sale in Mexico. Birdsell's points on appeal concern only his defense of insanity and the use of evidence obtained in Mexico under circumstances alleged to violate the Fourth Amendment.

After his arrest in Mexico, Birdsell was turned over to the United States authorities early in October, 1963. At the request of the jailer at Del Rio, Texas, Dr. George Herrmann, the jail physician, interviewed Birdsell for a few minutes; he was of the opinion that the prisoner needed psychiatric examination and attention, and so reported to the United States Marshal. On Birdsell's request, presented by court appointed counsel, the district judge, on December 18, 1963, directed that he be examined with respect to his sanity at the time of the offense and at that time by a qualified psychiatrist at the Veterans Administration Hospital at Waco, Texas.

The examination, by Dr. W. W. Good, was performed in two hours.[1] Birdsell first told the doctor he had come "on the advice of my commanding general, Nathan Bedford Forrest, Provisional Army Confederate States of America. He commands as Imperial Wizard of the Ku

1. This was Dr. Good's estimate. Birdsell stated the doctor had spent about 45 minutes talking to him and another 45 going over notes.

Klux Klan, and I am Imperial Wizard now *acting for him*." Questioning by the doctor elicited the less colorful explanation that Birdsell had been indicted for conspiring to transport automobiles into Mexico, and had been sent to the hospital by the judge. The examination consisted mainly of a long interview in which Birdsell related a history, including various episodes of emotional instability and demonstrating *intense* anti-Semitic, anti-Communist, and anti-Negro feelings that had led him into organized activities over a period of years. He said that he did not consider the stealing of cars to be illegal because "we are at war" and he was "simply foraging as is necessary for my Army. The cars were foraged to support the cause, that is, the KKK and the *movement against desegregation*." Although he knew Nathan Bedford Forrest was long since dead, he claimed to have visualized the General coming to him and giving him orders. On the basis of this interview, the doctor concluded, in a report dated January 10, 1964, that Birdsell "no longer knows right from wrong or the consequence of his acts" and "could not adequately cooperate in his own defense." His medical diagnosis was "schizophrenic reaction, paranoid type, chronic, severe," and he recommended indefinite commitment to a federal mental institution.

■ On January 23, the district court, acting through a different judge, entered an order in which it took note of Dr. Good's diagnosis, recited that it was "of the opinion that further study of the defendant's mental condition is imperative in order to arrive at a just and conclusive judgment as to defendant's true mental condition" and to decide whether he should be brought to trial or committed to the custody of the Attorney General, and directed that he be committed to the Medical Center for Federal Prisoners at Springfield, Missouri, for not more than 90 days, for examination "by qualified psychiatrists who shall furnish the Court with periodic reports of any and all findings which relate to the defendant's mental competency." This course was urged by the Government, which noted that Birdsell had undergone only a two hour examination, while at his arraignment, before appointment of counsel, he had been sufficiently rational to advise the court that "he was legally insane under the *Durham Rule \* \* \*."* A motion by the defendant objecting to such further psychiatric examination and requesting an immediate hearing as to competency to stand trial, under 18 U.S. C. § 4244, was denied.[2]

Birdsell was admitted at Springfield on February 1, 1964. A report of his neuropsychiatric examination was made on February 10 by Dr. Glotfelty, Chief of the Psychiatric Service. Eleven single-spaced pages of this are a history written by Birdsell for the examiner. Although this gibed with his recital to Dr. Good concerning his early life and his segregationist activities—indeed, going into much greater detail—it was quite different in many significant respects. He explained his recent automobile activities, not as "foraging" at General Forrest's command but on the

---

2. The court's direction for the examination at Springfield is one of Birdsell's points on appeal; although the statute, 18 U.S.C. § 4244, speaks of examination "by at least one qualified psychiatrist," he urges that if there are to be more than one, the examinations must be simultaneous rather than successive. We see no reason for reading such a limitation into the statute. Decision of competency lies in the court, not in the examining psychiatrist; the objective is to give the judge the expert aid he requires, and if he reasonably thinks a second opinion would be helpful, he ought be able to get it. If the judge had accepted Dr. Good's report, he could have committed Birdsell to the custody of the Attorney General, 18 U.S.C. § 4246, a further psychiatric examination would almost certainly have resulted, and all that would have been accomplished would have been two hearings instead of one. This is not to say that a judge may postpone the hearing required by 18 U.S.C. § 4244 pending an endless series of psychiatric examinations; we hold only that what was done here was well within the limits of the judge's discretion.

ground that he wished "work" that would take him to Mexico City where he could reflect on suggestions that he withdraw from segregationist activity or, alternatively, consider building up his anti-Negro program. Although he "came to realize the Mexico automobile activity was illegal there was nothing I could do to alter my position. On each subject I recognized the right-wrong values but obviously could not adhere to the right." He refused to accept key portions of Dr. Good's report. He denied having visual or auditory hallucinations, and explained his remarks about General Forrest as a recital of some "theatrics" in which he had indulged at a Klan meeting in 1960. And he gave content to the "war" reference by citing a statement of J. Edgar Hoover that "we are at war with the Communists" and by the analogy that the Republican party "fights" the Democratic party. The report recited that Birdsell requested return to the court, where he believed he could cooperate with counsel, understand the charges against him and assist in his defense. The diagnosis was "Emotionally Unstable Personality." The report elaborated on this by saying that Birdsell's "judgment may be undependable under stress and his relationship to other people is continuously fraught with stress and fluctuating emotional attitude because of strong and poorly controlled hostility, guilt and anxiety. Many of these individuals react with exciteability and ineffectiveness when confronted with minor stress. Paranoid thinking is denied. He attempts to conceal it."

The Springfield record also contains an extensive psychological evaluation, reflecting tests on five different days, by Dr. Geil, a clinical psychologist, and a medical examination report. Dr. Geil found Birdsell to be "a person of above average intelligence (IQ 112), whose personality organization reflects the presence of both a sociopathic disorder and a paranoid disorder"; "he appears to be actively striving to deny or keep his paranoid disturbance under a state of concealment."

The Springfield examination culminated, in accordance with regular procedure, in a meeting of four members of the psychiatric staff, including Dr. Glotfelty and Dr. Rothstein, of whom more hereafter. Birdsell appeared briefly before the staff,[3] reports were presented and discussed, and the staff joined in a formal diagnosis repeating Dr. Glotfelty's and recommending that Birdsell be returned to court as competent to stand trial. At a hearing on May 20 Dr. Glotfelty testified that Birdsell was competent to be tried and the defense agreed.

At the trial itself defendant's evidence of insanity consisted of testimony by Dr. Good, substantially along the lines of his initial report,[4] a stipulation that Dr. Herrmann would testify as above described, and two lay witnesses. Crawford Martin, Secretary of State of Texas, testified as to the impression Birdsell had made upon him during an extradition hearing in the summer of 1963; in the course of what Martin considered an able presentation, Birdsell informed the Secretary that he was Nathan Bedford Forrest. Martin thought either Birdsell was suffering from delusions of persecution "or he was an awful good actor." A Louisiana attorney who had represented Birdsell in a criminal case in 1956 and 1957 gave opinion testimony that Birdsell had a distorted understanding of right and wrong and could not adhere to the right. However, he conceded that he had not entered a plea of insanity on Birdsell's behalf in the two criminal trials in Louisiana, and his diagnosis of Birdsell as having "a paranoiac schizophrenic personality" was based to some extent on Birdsell's having told him that very morning that he had been in touch with General Forrest.

The Government relied, as countering the defense of insanity, upon the evidence, given by several witnesses, of in-

---

3. Time estimates of his appearance range from 13 to 25 minutes.

4. Dr. Good made no further examination of Birdsell, although he saw him briefly before testifying.

telligent and purposive behavior of Birdsell during the car theft conspiracy, without display of any of the abnormalities featured by the defense. Of particular importance was testimony by McDaniel, one of the conspirators, that while they were in jail together, Birdsell "said something about if and when he went to Court, if he was found guilty or something like that, he was going to plead anti-social or something * * * and try to convince them that he was insane, not insane, but he didn't like to be around other people, something like that * * * that he thought that he would be tried in Del Rio, and that the businessmen down there, being small town and everything, that they wouldn't understand the way he was pleading, and that they couldn't find him guilty on it, or something like that." McDaniel also testified that in the 60 or 70 days he was with Birdsell, the latter never said anything about being at war with the United States. In addition, the Government was allowed, over objection as to lack of testimonial knowledge, to adduce opinion testimony from Dr. Rothstein, based upon his contact with Birdsell at the staff conference and examination of the tests and history and records, that Birdsell was emotionally unstable but capable at the time of the crime of distinguishing right from wrong and adhering to the right.

■■■■ Birdsell contends that Dr. Rothstein's evidence was not admissible and that even if it was, the Government did not bear its burden on the issue of insanity.

(1). This Court has held that opinions as to sanity contained in hospital records are not admissible under the Business Records Act, 28 U.S.C. § 1732, and that such an opinion is receivable only if the expert rendering it is made available for cross-examination. England v. United States, 174 F.2d 466, 468–469 (5 Cir. 1949); Mullican v. United States, 252 F.2d 398, 404 (5 Cir. 1958). But that does not mean that the records of a hospital performing psychiatric investigations with respect to the symptoms recounted by the subject or the results of recognized psychological tests stand differently under the Business Records Act than do similar data concerning other forms of illness,[5] see McCormick, Evidence § 290 (1954); Thomas v. Hogan, 308 F.2d 355 (4 Cir. 1962).[6] While such material, unlike records of many physical symptoms, may be useless to a jury and be excludable on that ground, there is abundant authority that an expert witness who is available for cross-examination at the trial may use such records as the basis for an opinion without the proponent having to call every person who made a recorded observation. Travelers Ins. Co. v. Childs, 272 F.2d 855, 857 (2 Cir. 1959); Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637, 640–642 (1962); Alexander v. United States, 115 U.S.App. D.C. 303, 318 F.2d 274 (1963); Fitts v. United States, 328 F.2d 844, 847 (10 Cir.), cert. denied, 379 U.S. 851, 85 S.Ct. 96, 13 L.Ed.2d 55 (1964). With the increased division of labor in modern medicine, the physician making a diagnosis must necessarily rely on many ob-

---

5. We do not understand Otney v. United States, 340 F.2d 696, 700 (10 Cir. 1965), to hold to the contrary. When Otney is read along with Fitts v. United States, 328 F.2d 844, 847 (10 Cir.), cert. denied, 379 U.S. 851, 85 S.Ct. 96, 13 L.Ed.2d 55 (1964), it seems clear that, in line with the England and Mullican cases from this circuit, it holds only that a mere conclusion as to sanity in a hospital record is not admissible under 28 U.S.C. § 1732.

6. Although, as indicated in Chief Judge Sobeloff's able opinion, 308 F.2d at 359, this circuit has not gone so far as some others in admitting records of diagnoses, we do not agree that "the Fifth Circuit will permit introduction of hospital records only to show what treatment the patient received, the cost of services, and the like." 308 F.2d at 359 n. 5. The case cited, Missouri Pac. R.R. v. Soileau, 265 F.2d 90, 94 (5 Cir. 1959), which allowed the introduction of hospital records for that purpose, did not imply that such was the only permissible one.

servations and tests performed by others and recorded by them; records sufficient for diagnosis in the hospital ought be enough for opinion testimony in the courtroom. Dr. Rothstein had available a substantial amount of factual material, the truth of which is in no way challenged, in addition to his brief personal observation: copious history given by Birdsell, both in Waco and in Springfield; the results of a number of tests which Dr. Rothstein could himself interpret; Birdsell's physical examination; and recorded objective observations of Birdsell's behavior while at Springfield. It would indeed have been preferable if the Government had called Dr. Glotfelty, whom, as we were told at the argument, it excused on the score of personal convenience—a course of which we do not at all approve in a matter where the jury was entitled to the best help the Government could give; but we cannot say that Dr. Rothstein, who had reviewed all the hospital records and attended the staff conference,[7] lacked testimonial qualification.

■ (2) Birdsell claims that the examination at Springfield was only to test his competency to stand trial and that Dr. Rothstein therefore could not give probative testimony concerning his sanity when the cars were stolen. The issues are indeed different, both as to time and as to the critical mental state. But, even if we should accept the premise, it would not follow that a psychiatrist investigating the competency of an accused to stand trial can never be qualified to express an opinion as to his sanity a few months earlier. Many a discovery has been made in the course of a search for something else. Although "[i]t is not to be assumed * * * that a psychiatrist who has been ordered to prepare an opinion as to a man's trial competency will conduct the type of examination which is necessary to provide the trier of the facts with the information essential for a proper determination of

criminal responsibility," Winn v. United States, 106 U.S.App.D.C. 133, 270 F.2d 326, 328 (1959), a record may show that this was in fact done, and we think that was the case here. The Springfield examination had gone fully into the very elements of Birdsell's history and personality which had been considered by Dr. Good and which were vital to the formulation of an opinion of his sanity a few months earlier; indeed, the examination was much more thorough, including a large number of pertinent psychological tests. It would be most peculiar to hold that on these facts the Waco doctor could testify but a Springfield doctor could not. Neither the defense testimony nor the cross-examination of Dr. Rothstein revealed any further or different facts that ought to have been considered by a psychiatrist focusing solely on the issue of insanity at the date of the crime. Unlike the recently decided case of Johnson v. United States, 344 F.2d 401 (5 Cir. 1965), where the experts' testimony revealed that their examination had not supplied an answer to all the pertinent legal questions, Dr. Rothstein responded without difficulty when questioned on Birdsell's sanity at the time of the crime. A further distinction of Johnson, applicable also to Winn v. United States, supra, and to Williams v. United States, 102 U.S.App.D.C. 51, 250 F.2d 19, 26 (1956), is that there the defendants complained of failure by the Government to afford the full mental examination required, whereas Birdsell challenges the competency of one Government psychiatrist to controvert the testimony of another whose examination was no more profound. It is not argued that admission of Dr. Rothstein's testimony violated the direction, 18 U.S.C. § 4244, that "[n]o statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section * * * shall be admitted in evidence

---

7. Dr. Rothstein testified that the staff conferences at Springfield were by no means a formality, and that the discussions would lead to a conclusion which "quite frequently * * * is at variance with the original doctor's examination."

against the accused on the issue of guilt in any criminal proceeding," although, of course, Dr. Rothstein relied in part on the history that Birdsell gave Dr. Glotfelty. Compare Edmonds v. United States, 106 U.S.App.D.C. 373, 273 F.2d 108, 114 (1959), cert. denied, 362 U.S. 977, 80 S.Ct. 1062, 4 L.Ed.2d 1012 (1960); Ashton v. United States, 116 U.S.App.D.C. 367, 324 F.2d 399 (1963). Cf. Coffman v. United States, 290 F. 2d 212 (10 Cir. 1961). See also Fouquette v. Bernard, 198 F.2d 860 (9 Cir. 1952), cert. denied, 345 U.S. 912, 73 S. Ct. 652, 97 L.Ed. 1346 (1953); Early v. Tinsley, 286 F.2d 1 (10 Cir. 1960), cert. denied, 365 U.S. 830, 81 S.Ct. 717, 5 L.Ed.2d 708 (1961); 8 Wigmore, Evidence § 2265(10), at 399 & fn. 12 (McNaughton rev. 1961).

■ (3) Birdsell's argument that the Government failed to meet its burden on the issue of insanity is largely answered by our summary of the evidence. Although the case made by the defendant was substantial, it was in no way conclusive. Dr. Herrmann's observation amounted to nothing or nearly so. Dr. Good's diagnosis was reached so quickly that the jury could well have thought he had jumped to a conclusion—or, indeed, particularly in view of McDaniel's testimony, that Birdsell had been pulling his leg. The evidence strongly suggested the possibility that Birdsell's first gambit had been to obtain a ruling of incompetency to stand trial and that, when confronted with the more thorough examination at Springfield and the prospect that, even if successful there, he would be committed under 18 U.S.C.

§ 4246, he changed his tune, still hoping to prevail at the trial. Dr. Good stated that it would not be possible for a person in what he thought to be Birdsell's mental condition "to fake sanity in order to get out of Springfield," and Dr. Rothstein testified to the same effect. It was undisputed that Birdsell was emotionally disturbed. But whether the instability was so severe as to render him insane in the relevant sense during the six months period when he was conspiring to transport stolen automobiles was an issue for the jury to determine under proper instructions, here given in the form approved in Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897).[8] A reasonable juror could well have been convinced beyond reasonable doubt that Birdsell deliberately exaggerated his symptoms in the extradition proceedings before Secretary Martin, in his interview by Dr. Good, and in his talk with the Louisiana lawyer; and that Dr. Rothstein's testimony more accurately indicated his true mental state at the time of the crime. The crucial question was whether it was Birdsell's usual appearance of sanity or his occasional appearance of insanity that was a "mask." Compare Cleckley, The Mask of Sanity (1941), discussed in United States v. Currens, 290 F.2d 751, 762 (3 Cir. 1961). Wisely or not, our system leaves decision of such issues, on which experts may honestly disagree, to a jury of twelve laymen. We cannot say this jury lacked adequate basis to find Birdsell sane.[9]

8. For reasons similar to those expressed in Judge Hastie's dissent in United States v. Currens, 290 F.2d 751, 776 (3 Cir. 1961), we do not think this an appropriate case for revisiting the issue of the proper instruction on insanity, on which this Court in banc divided equally in Carter v. United States, 325 F.2d 697 (5 Cir. 1963), cert. denied, 377 U.S. 946, 84 S.Ct. 1353, 12 L.Ed.2d 308 (1964).

9. Birdsell claims that "plain error," F.R. Crim.P. 52(b), was committed as to two episodes in Dr. Rothstein's testimony on

examination by the Government to which no objection was made. One was a statement that his diagnosis tallied with one made in a 1944 Army psychiatric examination; the other was an opinion that he was not sure whether Birdsell would be committed to a mental institution but that, if so, "they would probably discharge him fairly quickly."

The 1944 report, as summarized by Dr. Rothstein, did not label Birdsell "psychotic" but mentioned "constitutional psychopathic, inferiority, emotional instability" and must have helped Birdsell

(4). Birdsell's supplemental brief contends that the court erred in admitting, over objection, evidence from his person turned over to the Mexican police and obtained by their search of the two stolen cars which he and Callender were bringing into Mexico; he argues that his arrest was without probable cause, that the immediately ensuing search was illegal and that a later search was so in any event for lack of a search warrant. The argument fails on several independent grounds.

 One is the failure to have raised the issue by a pre-trial motion as required by F.R.Crim.P. 41(e). Garcia v. United States, 315 F.2d 133, 135 (5 Cir), cert. denied, 375 U.S. 855, 84 S.Ct. 117, 11 L.Ed.2d 82 (1963). Another is that the Fourth Amendment does not apply to arrests and searches made by Mexican officials in Mexico for violation of Mexican law, even if the persons arrested are Americans and American police officers gave information leading to the arrest and search. Decisions such as Best v. United States, 184 F.2d 131, 138 (1 Cir. 1950), cert. denied, 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677 (1951), and Reid v. Covert, 354 U.S. 1, 5–8, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), rest on the basis that the United States itself was acting abroad, as a result of military occupation or treaty; their reasoning, that the United States is bound by the Bill of Rights wherever it acts, is inapplicable to an action by a foreign sovereign in its own territory in enforcing its own laws, even though American officials were present and cooperated in some degree.[10] The record would support a finding that Birdsell was not arrested until after the search and that he consented to the latter, which produced a punch for duplicating car keys and a series of blanks. Moreover, in the context of the considerable traffic in stolen automobiles across the Rio Grande, the arrival at Ciudad Acuna of two new Ford Thunderbirds driven by Americans who claimed to be "Vicente Munoz" and "Juan Pacheco" although they could not speak or understand a word of Spanish and required the assistance of Deputy Sheriff Perez as interpreter,[11] and who insisted on driving to the interior over a road which they were warned was unsuitable for ordinary passenger automobiles rather than reenter the United States for access to a good highway, might well meet even Fourth Amendment standards for arrest. If more was needed, Birdsell's offer of a bribe to the police officer, shortly after he entered the police station and arguably before arrest, would tip the scale. We are equally unimpressed by the point that further evi-

as much as it hurt him. Assuming in Birdsell's favor that the rule in this circuit as to the inadmissibility of recorded diagnoses made it error to allow Dr. Rothstein to mention the Army's conclusions, although these must have been understood as mere background information, the error was not so serious as to call for reversal under the "plain error" rule.

We read the second bit of testimony as simply summarizing Dr. Rothstein's opinion that Birdsell's psychiatric disorder lacked serious magnitude and not as having the implication which appellate counsel attributes to it. This is quite unlike the belittling statement made by a judge under the District of Columbia statute requiring him to instruct the jury that commitment will follow a verdict sustaining the defense of insanity. See Durham v. United States, 237 F.2d

760, 762 (1956). Compare Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725, 730 (1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1959).

10. We do not mean to say that in a case where federal officials had induced foreign police to engage in conduct that shocked the conscience, a federal court, in the exercise of its supervisory powers over the administration of federal justice, might not refuse to allow the prosecution to enjoy the fruits of such action. But, as indicated in the text, *infra*, the instant case is a far cry from that.

11. Deputy Sheriff Perez of Del Rio, Texas, and a colleague were enroute from Del Rio to Ciudad Acuna on other matters when they were told that the Mexican customs authorities wished their aid.

dence was obtained from the cars when an FBI agent arrived several hours later and inspected them with the Mexican police. Apart from the inapplicability of the Fourth Amendment to a country whose laws may not even provide, much less require, the counterpart of a search warrant, the record would afford a fair basis for a finding of consent.

The Court is indebted to O. Don Chapoton, of the Houston Bar, for a forceful presentation of Birdsell's case, in which no possible argument has been overlooked. No defendant able to pay counsel could have received finer representation.

The judgment of conviction is affirmed.

On Petition for Rehearing

PER CURIAM.

It is Ordered that the Petitions for Rehearing filed in the above entitled and numbered cause by assigned counsel for appellant and by appellant *pro se* be, and the same are, hereby denied.