**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Teodoro DAVILA–NATER,
Defendant-Appellant.**

No. 72–2324.

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 1973.

Rehearing and Rehearing En Banc
Denied March 26, 1973.

Wisdom, Circuit Judge, dissented and filed opinion.

272

Joseph A. Calamia, John L. Fashing, El Paso, Tex., for defendant-appellant.

William S. Sessions, U. S. Atty., San Antonio, Tex., Edward S. Marques, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before WISDOM, BELL and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

A few minutes before closing time, August 5, 1971, when only one woman employee was present at either facility, the State National Bank of El Paso and the El Paso National Bank were simultaneously robbed by three men. The total amount taken was $36,176.94. Both banks were located in the same building, with a common lobby, on the grounds of the William Beaumont Hospital.

It was later developed that the offense had been committed by Teodoro Davila-Nater (Davila) (age 24), Jose Felix Hernandez (age 25), and Juan Jesus Martinez (age 26).

Hernandez and Martinez pleaded guilty, in one count, to the robbery of the State National Bank. The counts with reference to the El Paso National Bank were dismissed.

A jury convicted Davila of violating 18 U.S.C. § 2113(a), the Bank Robbery statute, in that on August 5, 1971, he robbed the El Paso National Bank of $22,500 in money. He was also convicted of violating 18 U.S.C. § 2113(d) in that he assaulted and put in jeopardy the life of a bank employee by the use of a gun.

He was acquitted of the robbery of State National Bank. His co-defendants testified that Davila never physically entered the space assigned to that bank, although they, in furtherance of the common enterprise, did so. See 18 U.S.C. § 2, Principals.

When the case came to trial, both Hernandez and Martinez described not only the genesis of the criminal plan but also its execution, including a detailed resume of Davila's performance at the scene. Angel Sanchez was one of Davila's friends, who loaned him the car in which he got out of El Paso and ultimately landed in Puerto Rico. Sanchez testified that on more than one occasion, both before going to Puerto Rico and after his return, Davila privately told him of his part in the robbery, including the use of a gun.

In this state of affairs, the appellant sought refuge behind a strongly implemented psychiatrical defense that at the time of the robbery he was suffering from a mental disease or defect from which he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, Blake v. United States, 5 Cir., 1969, 407 F.2d 908. This is the ground over which the trial was fought vehemently to a finish.

Davila was sentenced to concurrent terms of fifteen years each, to be eligible for parole at the discretion of the Board, 18 U.S.C. § 4208(a)·(2). Apparently no one directed the attention of the court to the fact that this was an erroneous sentence. See Burger v. United States, 5 Cir., 1972, 454 F.2d 723, and the three prior decisions of this Court therein cited. Separate penalties under the various sections of the Federal Bank Robbery statute are improper, whether imposed consecutively or concurrently.

Within the foregoing context we shall discuss individually the errors assigned in search of reversal.[1]

I. Mrs. Rosch's Unexpected Change of her Identification Testimony

When the robbery occurred Mrs. Bernice Ruth Rosch was the teller on duty at the El Paso National Bank.

At a pre-trial hearing, the prosecution made it known that Mrs. Rosch could not identify the robber or robbers.

In his opening statement, the Assistant United States Attorney, informed the jury:

"I don't expect any identity from the two ladies that will be taking the stand as to who was the ones that held them up. The identification will come, I feel and believe, through the testimony that will be given to this jury by the other two individuals that held up the bank. As the Court indicated to you at the beginning of the

case, Jose Felix Hernandez has plead guilty to the offense. Juan Jesus Martinez has also plead guilty to the offense, and they are going to come into this courtroom and tell you today that this Defendant Davila-Nater was the third individual involved in this robbery."

Mrs. Rosch soon took the stand. She had been an employee of the El Paso National Bank for a total of thirty-one years. On August 5, 1971, she had been working at the Beaumont Branch as relief for a male employee who was on vacation. She then described the robbery. Then came the surprise:

"Q. I will ask you to take a look at the Defendant Davila. Can you identify him as being the man that held you up, Mrs. Rosch?

"A. He was one of them, yeah.

"Q. He was one of the men? Do you recall if he was the one that actually held you up?

"A. Well, I wouldn't want to say that, sir."

Mrs. Rosch then agreed that she had viewed a lineup but did not then identify the defendant.

On cross examination:

"Q. [D]o you remember seeing the Defendant there at the lineup at that time?

"A. Yes.

"Q. My question is, at that lineup, Mrs. Rosch, you never made any indication or did you ever say that this Defendant appeared to be one of the men involved in the bank robbery, isn't that true, that you never did?

"A. I did not, but that isn't true, that I didn't think it sir.

"Q. I see. But you were asked several times if anyone in that lineup was involved—just a moment, let me finish my question, was

[1]. Appellant assigns twenty errors. We have, of course, considered them all. We omit discussion of those which, in our opinion, are without merit or fall within the prescription of our Local Rule 21.

"involved in the bank robbery and if so, would you please point him out, and weren't you asked that question very carefully?

"A. I was asked that question once and I said that the first one on the end looked familiar to me.

"Q. And do you recall in which position the Defendant was?

"A. He was the third in the lineup.

"Q. The third in the lineup? And at no time—my question is, at no time did you tell—I am not asking what you thought, I am asking what you told in response to the question by the Federal Bureau of Investigation man, did you tell *me or Mr. Turtle* (emphasis added) that this Defendant appeared to be one of the men? Can you answer that 'yes' or 'no'?

"A. No.

"Q. Did you tell us?

"A. I did not tell you.

"Q. All right you kept your own reservations to yourself, is that what you are saying.

"A. That is what I am saying.

"Q. Wasn't it explained to you by Mr. Turtle that it was very important, the process and necessity of a lineup?

"A. He explained it to me and told me this fellow said I could not identify him.

"Q. Before the lineup, Mrs. Rosch, weren't you told that it was very important that you be careful to properly examine, observe and then make your identification known or non-identification known?

"A. Right.

"Q. And isn't it a fact that this is the first time that you have told anyone that this Defendant appears to be or is the man that robbed you that day or took part in the robbery.

"A. I told the District Attorney and the FBI agent as we left that the third fellow on the lineup, this Davila did look familiar but his heighth was so that I was thrown off. [Davila was the fourth man].

"Q. Did you tell Mr. Eddie—have you talked with Mr. Edward Marquez concerning this case, the District Attorney that just interrogated you here?

"A. I talked to him.

"Q. Did you tell him that you could and you were going to identify Teodoro Davila-Nater as being one of the men involved in this bank robbery or did you tell him that you could not identify him?

"A. I told him I could identify him.

"MR. CALAMIA: Your Honor, I am going to invoke the theory and holding of Brady vs. Maryland so that if there is anything incorrect in this testimony I expect the United States Attorney to make it known to the Court and to the jury."

The record reveals that at the noon recess the prosecution informed defense counsel that Mrs. Rosch had, indeed, told him that she could not identify the defendant and that he was willing to take the stand and would so testify. It may be hindsight, but it seems strange to us that apparently it never occurred to either counsel that the prosecutor could have quickly filed a written stipulation of these facts and it could have been read to the jury. No one suggested this course. Failing this approach, the United States Attorney could, of course, have entered a verbal stipulation.

What actually happened was that, considerably later, defense counsel, without stating his purpose, asked to call the United States Attorney as a witness. Whereupon the Court announced, "I won't permit you to call the District Attorney".

Thereafter, the defense called the F. B.I. agent, Eugene Patrick Turtle, Jr.,

who testified that Mrs. Rosch did not identify Davila at the lineup but was not specifically asked whether she had (as she stated) told him later that she could identify Davila.

In the closing arguments to the jury the prosecutor made no reference to Mrs. Rosch's testimony, but defense counsel dwelt on it at some length:

"The Government makes an opening statement saying neither lady can identify him and they put on Mrs. Rosch and she said she told the District Attorney that she was going to identify him and she said 'I told the FBI agent and the District Attorney on the day of the lineup that I thought, yes, it was the number three man in the lineup. I didn't say it in front of the defense counsel but I told the FBI and I told the United States Attorney as we were going out.' The Government knew that the facts were otherwise. The Government did not get up and say 'Wait a minute, I want to clear this up for the jury. [Mrs. Rosch never told me that. She never told me she was going to identify the Defendant.' Why? Because why would I have said in my opening statement that neither of my witnesses are going to identify the Defendant? We had to call the FBI agent, and Mr. Calamia asked him, under subpoena duces tecum 'may I look at your record?' And he is an honest man and he said she did not identify the Defendant, that she identified number one. 'She never told me later that it was number three.'

"Well, Mr. Davila wasn't even number three in that lineup. He was number four. Now this is the type of evidence the Government has. The witness takes the stand and they come in and they know this is the one that has been accused. It is very easy to turn over and say, 'Yeah, that is him.'

"I say that part of her testimony should be given no consideration, now any person when they are sitting in that box, occupying the stand as a Government witness, and it is so easy to turn and say 'Yes, that is him.' Because they know who the lawyers are and they have talked with the Government and they have seen what has gone on and they came in and were sworn and the Government put on evidence that this bank meets all the requirements to come within this law, and I wonder and doubt, and I don't believe they have proved that."

Appellate counsel now argues most vigorously that his inability to impeach Mrs. Rosch by the testimony of the Assistant United States Attorney denied his client a fair trial.

He cites Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, a case in which the prosecution knew before the trial that false testimony would be used; Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, where the statement was elicited from a witness that nothing had been promised him, when, in fact, it had, and this perjury was concealed; Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9, in which the witness was cautioned by the prosecution not to reveal evidence known to be favorable to the defendant; Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, in which the prosecution withheld a statement beneficial to the defendant and which had been requested, and Giglio v. United States, 405 U.S. 1972, 92 S.Ct. 763, 31 L.Ed.2d 104, requiring that favorable evidence known to any prosecutor in the office had to be revealed.

These eminently sound cases are not altogether analogous to the one now before us, although they undoubtedly fall in the same general category as this case. They indisputably stand for the principle that prosecutors must not, by commission or omission, wilfully commit acts causing a defendant to be denied an opportunity for a fair trial under due process of law.

Upon mature consideration, however, of the episode hereinabove described, we are convinced that, within the four cor-

ners of this case, it was harmless beyond a reasonable doubt:

1. The prosecutor told the jury at the very outset that he did not expect Mrs. Rosch to be able to identify the defendant;

2. The evidence was undisputed that Mrs. Rosch did not identify the defendant at the lineup;

3. Mrs. Rosch specifically declined to say that Davila was the one who actually robbed her;

4. There was no effort to attack the in-court identification except to try to impeach as to what had been told the prosecutor;

5. Without stating his reasons, defense counsel moved to put the prosecutor on the witness stand, a procedure not ordinarily looked upon with favor because the trial of a defendant, in the absence of the most compelling reasons, is not to be converted into a trial of the prosecutor, including the possible issue of his veracity in the midst of a trial which he is required to conduct;

6. There were other preferable methods by which the matter could have been handled, but which were not requested;

7. The point in controversy was whether the witness had told the District Attorney that she could identify the defendant, whereas, that official had already assured the jury that he did not expect such an identification, a statement he most surely would not have made if he had been informed to the contrary;

8. And it was a matter about which the defense took telling advantage in the closing argument.

In the main, however, these are prefatorial observations.

The consideration which brads the nail is the fact that both of Davila's confederates described his participation in detail. His friend, the automobile lender, recounted Davila's privately expressed admissions of guilt. No witness testified to an alibi or, in any other manner, that Davila was not present and participating in the robbery.

Vigilant counsel for Davila argues, however, that since the jury acquitted the defendant of robbing the State National Bank, for which the sole eyewitness identification came only from his co-defendants, and since he was convicted as to El Paso National, about which Mrs. Rosch testified, then her testimony was the cause of the conviction. This argument would be most persuasive if Mrs. Rosch had not refused to say, on the witness stand, that she identified Davila as the one who actually robbed her (that is, El Paso National).

■ From the record as a whole, viewing this incident in its entirety, and considering the overwhelmingly strong evidence of Davila's participation, we are of the view that what Mrs. Rosch swore she had told the District Attorney could not have influenced the jury on this issue. It was thus harmless beyond a reasonable doubt.

■ It is well established in this Circuit that an error which might have been prejudicial in a close case does not require reversal when the evidence of defendant's guilt is strong, United States v. Lipscomb, 5 Cir., 1970, 435 F. 2d 795, cert. denied 401 U.S. 980, 91 S. Ct. 1213, 28 L.Ed.2d 331, rehearing denied 402 U.S. 966, 91 S.Ct. 1635, 29 L. Ed.2d 131; Loftis v. Beto, 5 Cir., 1971, 450 F.2d 599.

The problem now before us has Constitutional overtones, but in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), a capital case, the Supreme Court declined to reverse for a *Bruton* error because the direct evidence of guilt was so overwhelming that the asserted error was harmless beyond a reasonable doubt.

We now consider a much more difficult issue.

## II. DAVILA'S MENTAL STATUS

This Court has rarely, if ever, had an opportunity to review a more extensive

controversy as to a defendant's mental status at the time of an alleged offense.

The psychological and psychiatrical evidence was impressive. To avoid prolonging this opinion beyond that necessary to a decision, we now synopsize.

When the government rested and a motion for an instructed verdict of not guilty had been denied, the defense came forward with its proof of mental status as of the day of the alleged robbery.

■■ If there is some evidence supporting a defendant's claim of insanity, the issue must be submitted to the jury. Once the hypothesis of insanity is established, the burden is on the prosecution to prove by the evidence beyond a reasonable doubt that the defendant was sane at the time of the commission of the alleged crime and was possessed of the requisite criminal intent, Blake v. United States, 5 Cir., En Banc, 1969, 407 F.2d 908.

A. Evidence of Mental Status for the Defendant

The first witness for the defendant was his mother, Mrs. Isabel Maria Nater, a social worker in Puerto Rico. The defendant was born September 24, 1946. He had been married four times. One marriage lasted nineteen days, one lasted two months, and a third lasted only a day. He was graduated from high school in Baja Vega, Puerto Rico, in 1963. As a child he was depressed because of the absence of his father, from whom his mother had been divorced when the defendant was three years of age. Defendant was obsessed with a desire to become a soldier and also to have a son. He enlisted in the Army, with her consent, 1964; trained at Fort Bliss, El Paso. He served in Korea and received an honorable discharge in 1966. He re-enlisted in 1967, shortly after he had married a girl in El Paso. Afterwards, he was in a military hospital in Columbus, Georgia, [for injuries sustained in a parachute jump]. He went AWOL and spent several months in Puerto Rico before the F.B.I. came for him. He went AWOL a second time and ultimately received a discharge under conditions other than honorable (undesirable). The mother took the son to a psychiatrist, Dr. Marcos Rosado Del Valle, in Puerto Rico, March 12, 1970. He disappeared on March 22 before he was to see the psychiatrist again on March 24. Mrs. Nater was of the opinion that on March 12, 1970, the defendant was "of unsound mind". He came back to Puerto Rico in August, 1971 [right after the alleged bank robbery].

On cross examination, Mrs. Nater testified:

"Q. Mrs. Nater, did your son at any time discuss the examination conducted by the psychiatrist while he was in the Army?

"A. I remember one occasion among many where he was examined by a psychiatrist in the Army. He talked to me something about it.

"Q. All right. Can you tell this jury whether or not at that time the psychiatrist found him to be sane?"

Defendant objects on the ground that the psychiatrist "is not here to be examined". Objection overruled.

"A. No, they found another disability, according to the doctor.

"Q. What did your son tell you about that examination, Mrs. Nater?

"A. My son was AWOL three or four times repeatedly after an accident, according to my information, because I was always seeking information from the Army. They would always take him to a psychiatrist of the Army and the psychiatrist of the Army would examine him and would treat him. At Puerto Rico he was seen by a psychiatrist as I have already said, at Ft. Buchanan.

"Q. Mrs. Nater, I asked you one question, and the question was did your son ever tell you what the psychiatrist said about this mental capacity while he was in

the Army? Did your son ever discuss this with you?

"A. No, not that.

"Q. That is all I am asking. Were you aware what the psychiatrists have said? Have you had a chance to see his Army medical records?

"A. Yes, sir.

"Q. All right. Your Honor at this point, I move Mr. Calamia tender to me the medical records he obtained from the District Clerk about his medical—may I have that, please?"

Counsel for defendant [Mr. Calamia]:

"That is what we object to, Your Honor. We object to the reports signed by Kenneth M. Berc and Elmo M. Vinas, Jr., to the diagnosis and findings, because those are legal— those are medical conclusions and opinions that are not admissible and are hearsay since these people who made this report are not here to be cross examined. This portion of the report is hearsay and I move that it not be admitted.

"THE COURT: This is proved up. The Court will admit the entire record, including this."

Whereupon, Government's Exhibit 4, duly certified by the National Archives and Record Service of the General Services Administration and by the Chief of the National Personnel Record Center at St. Louis was admitted into evidence.

Mrs. Nater was then asked whether she was able to identify Government Exhibit 4 as being personnel records of her son, Teodoro Davila-Nater. She stated that she had seen the records, including the report of Dr. Kenneth M. Berc, Psychiatrist.

The report, read to the jury, reads as follows:

". . . seen for psychiatric evaluation on 12 December, 1969. The subject related that he has been AWOL three times. He feels that he can't cope with the Army anymore because of his many problems back home. He has had three court martials and one Article 15. He has no civilian convictions.

"Mental status examination reveals a well-oriented male with intact memory for recent, remote, and immediately past events. Judgment was intact in terms of simple actual situations. There was no evidence of fault disorder, delusions, or hallucinations. Affect was stable and appropriate.

"Diagnosis: Emotionally unstable personality.

"Findings: This man was and is mentally responsible both to distinguish right from wrong and adhere to the right. This man has the mental capacity to understand and participate in the board proceedings. This man has no disqualifying mental or physical disease or defect sufficient to warrant discharge through medical channels. This condition is not amenable to hospitalization, treatment, disciplinary action, training, or reclassification to another type of duty. This enlisted man will continue to be a non-effective soldier throughout his tour of duty.

"Recommendations: 1. Psychiatrically cleared for any administrative or disciplinary action.

"2. It is recommended that Teodoro Davila-Nater, Private, 482 84 8825 be separated from the service under the provisions of AR 635–212."

The next witness for the defendant was his sister, Mrs. Isabel Maria Davila, age twenty-seven, the divorced mother of three, then living with her mother in Puerto Rico. She testified that in November, 1969, she found her brother trying to hang himself with a rope to a tree of their yard in Puerto Rico. She called her grandmother and they got him down. Later, he told his sister that he had killed her mother [untrue]. The sister was later recalled to testify to another hanging episode in the laundry of the home, in which he was again saved

by his sister and grandmother. She said she forgot about this incident when she was first on the witness stand.

[When Davila was examined at Springfield in February, 1972, he denied ever attempting suicide, as will be seen later].

At this point, Dr. Marcos Rosado Del Valle, age 46, took the stand. He was a graduate in medicine of the University of Mexico and had completed a three year residency in psychiatry at the University of Puerto Rico. He saw the defendant on March 12, 1970, for one hour. He diagnosed him as a borderline patient, *disorder of the character*. On May 12, and May 14, 1972, nine months after the robbery, for a total of two and one half hours, he saw the defendant in jail at El Paso. No psychological tests were administered, but the doctor had the benefit of the Army report (Government's Exhibit 4) already alluded to. From his observation, and despite anything contained in that report, the psychiatrist was of the opinion, to a reasonable medical certainty, that on May 14, 1972, Davila had "a disturbance of the personality with anti-social conduct, with a reaction of depressive-manic, an effective psychotic".

He was further of the opinion that on August 5, 1971, Davila was psychotic and going through an episode of mania —was mentally ill within the requirements of *Blake*.

The next witness called by the defense was Dr. R. G. Bennett, a board certified psychiatrist, who, from 1943 to 1951, had been a consultant psychiatrist for McNeil Island Federal Penitentiary. Dr. Bennett had interviewed members of the family, including the former in-laws and the ex-wife. He saw Davila September 30, 1971, October 3, 1971, and December 9, 1971. *He had studied Davila's military and hospital records.* He thought that on September 30 the defendant was "perhaps mildly depressed to near normal, no illusion of systems". By December 9 he considered that Davila "had a sociopathic personality disorder, but this may have just been the symptom of something more". He felt that Davila had been manic depressive, with periods of remission since 1967.

Dr. Bennett's testimony concluded:

"I feel it is highly probable that he was ill at that time [August 5, 1971] and he lacked substantial capacity to either appreciate the criminality or wrongfulness of his conduct or conform his conduct to the requirements of the law." [2]

On cross examination, the doctor testified:

"No, I did not find him psychotic at the time I saw him [September 30, 1971].

It was at this point that the defense took a highly significant step. Counsel for Davila, on redirect, asked Dr. Bennett if he had "had an opportunity to look at Dr. Fain's report from Springfield, Missouri, in this case?" He responded in the affirmative and said that he disagreed with the diagnosis.

On re-cross, Dr. Bennett said he had also considered Government's Exhibit 4 [the military records; the report of Dr. Kenneth Berc] but that Davila might have been in remission at that time.

The next witness called by the defense was Dr. Milton Raskin, board certified psychiatrist, who had examined Davila the week before [May 11, 1972]. He had looked at the military hospital records. He found Nater to be a manic depressive. His opinion was that on August 5, 1971, the defendant suffered from a mental disease or defect, within the rule of *Blake*.

On cross examination, Dr. Raskin stated that "he had seen the report from

2. We do not detail the case history or the reasons upon which the various medical witnesses relied. To do so would be to compile a corpus juris of psychiatrical procedures, conflicts of expert opinion, et cetera. The significant factor is that in arriving at their conclusions the psychiatrists considered the reports from the Army and from Springfield.

the Bureau of Prisons, Springfield, Missouri, that of Dr. Fain and the other doctors that examined this defendant at Springfield", as well as the Berc report of December 17, 1969, and that Davila told him of his arrest for rape in Chicago on October 18, 1966, "a bum rap".

At this point the defense rested.

### B. The Prosecution Evidence of Mental Status

The government called Dr. J. Edward Stern, a board certified psychiatrist. On September 28, 1971, and again on September 30, 1971, he had subjected Davila to an electroencephalographic [E.E.G.] test. The results were normal.

Dr. Ivan C. Smiley, a board certified radiologist, had interpreted a brain scan of the defendant and found it to be normal.

Dr. Clarence G. Hackett, a clinical psychologist, Ph.D. in psychology from Purdue University, a fellow of the American Psychological Association, at the request of Dr. R. J. Bennett [above mentioned] had administered to Davila the Welchler Adult Intelligence Scale Test, the Bonder Gestalt Test, and the Rorschach Test.

The Rorschach test had shown that Davila showed no evidence "of any thinking disorder or really of any serious mental or emotional disturbance". He did feel from "interview and testing" that Davila had "an antisocial personality disorder". He saw no evidence that Davila was a manic depressive. There was nothing in the examination to suggest that on August 5, 1971, the defendant had been unable to understand or comprehend the wrongful nature of his conduct and was quite capable of understanding the requirements of the law. Dr. Hackett had "no basis" for thinking that Davila on the day of the robbery suffered from any impairment of thinking or inability to conform to the law.

### C. The Springfield Report

The District Court ordered the defendant admitted to the United States Medical Center for Federal Prisoners at Springfield, Missouri, for an evaluation of his competency to stand trial, 18 U.S. C. § 4244, and for an opinion as to "responsibility at the time of the alleged offense". The Medical Center was directed to provide copies of its report to the Court, to the United States Attorney, and to defense counsel.

The defendant was admitted to the facility on February 10, 1972 and discharged March 21, with copies of the reports to the court and counsel on both sides. These reports constituted Government Exhibit 6, about which there was so much objection in the court below, and here.

The report of the psychiatric staff examination was signed, *for the staff,* by Dr. H. Wayne Glotfeltz, then Chief, Psychiatric Service. Omitting the preliminaries, that report was as follows:

"Since admission to the Medical Center medical, physical and psychiatric examinations have been performed. The physical examination was essentially negative except for the history of former drug use, Marijuana, and a question of pulmonary tuberculosis. The sputum culture was normal flora. Routine blood, urine and VDRL were within normal limits. His blood type Rh factor is O positive. The skull x-ray and chest x-ray were within normal limits. The psychiatric opinion was passive-aggressive personality trait disturbance, inadequate personality with passive-aggressive trends.

"On February 24, 1972, he was examined by a consulting psychologist who found no evidence of an active psychotic process.

"On psychological examination it showed chronic personality disorder, characterized by poor impulsive control.

"On March 2, 1972, he was interviewed by the staff, and discussed his activities of the past, and the alleged charges against him. He gave the staff no information that would indicate that any time in the past he had been considered incompetent or irre-

sponsible. He lists his employment as a gigolo and has apparently been very successful living off various women who have supported him. In the future he would like to go to Spain and finish school as his grandfather who is quite wealthy in Puerto Rico stated he would assist him.

"Therefore, if a competency hearing should be held the staff would recommend that he be adjudicated as competent and responsible."

Attached to this staff report was the written psychiatric examination report of Dr. H. B. Fain. This report mentioned no opinion as to Davila's mental responsibility on the day of the robbery or at any other time, although its terms negated, without specifically saying so, any psychotic condition.

At the trial, Dr. H. B. Fain, chief of psychiatry at the Springfield Medical Center (deputy chief at the time Davila was there) took the stand for the prosecution. Dr. Rochman had given the defendant a physical examination and neurological screening. Dr. Murney had performed a battery of psychiatric tests, object tests, written tests, general intelligence tests, the revised Benet test, the Bender Gestalt test, the Minnesota Multi-Facet Personality Inventory, which includes the neurotic scale, the schizophrenic scale and the organic scale, and the Rorschach psycho-diagnostic test.

At this point, the defense objected to any statement of the conclusions reached by Dr. Murney because he was not in court and not available for cross examination. The objection was overruled, the trial court holding that Dr. Fain could "state any reports that he had from the staff members that helped him conduct this examination".

Dr. Fain then stated that Dr. Murney's conclusions were that the tests suggested

"Characterogical problems with a neurotic overlay, and that there was some elevation on the neurotic triad which would indicate that this patient being tested had a lot of feelings of sexual inadequacy, that he also was somewhat anxious and had some depressive signs. He worries about his physical health a great deal.

"But he did not find evidence of thought disturbance or psychosis, and we have his written report, which is a part of the official record."

Dr. Fain had, he said, used that report in arriving at his opinion of the subject's mental status.

Then, again over objection, Dr. Fain stated that the psychiatric staff came to the conclusion that Davila had the capacity to understand the charge, that he could cooperate with counsel and assist in his defense.

On the Revised Intelligence Test, Davila had scored an IQ of 98 and on the Welchler Adult Intelligence Scale he had scored 105 which is within average intelligence range.

Dr. Fain further testified as follows:

"On the morning of February 24, 1972, Mr. Davila arrived for his interview unescorted from his assignment within the institution. He proved to be oriented in all spheres and capable of expressing himself in a rational and coherent manner, despite minor problems in using the English language.

"He impressed me as being bright, alert and responsive. From the outset he took the definite position that he had been falsely accused of the offense and that he can definitely prove that he was in Puerto Rico at the time the alleged offense occurred. Initially in the interview I got the impression that he was totally unaware of the circumstances or any of the individuals involved in the alleged crime but as the interview progressed I learned he knew both of the other individuals charged with the crime."

\* \* \* \* \* \*

"He does demonstrate the presence of neurotic problems but as far as I can determine there is no evidence of psychotic process."

By way of opinion as to Davila's mental status on the day of the robbery, Dr. Fain stated:

"My opinion is that there was nothing in our study that would indicate that he lacked substantial capacity to appreciate the wrongfulness of his act or could not conform his conduct to the requirements of the law."

This closed the evidence on the insanity issue.

## III. THE DECISION ON THIS POINT

We have given an elaborate description of the testimony on the insanity issue and the trial maneuvers incident thereto because diligent counsel for the defendant has assigned no less than twenty trial errors which he says should justify a reversal. Two of these errors have been discussed *ante*. All assignments have been carefully considered but we shall now discuss only those which, in our opinion, merit discussion for the appropriate disposition of the appeal.

The really important assignment is stated as follows:

"Did the District Court violate Davila-Nater's rights of confrontation, of cross-examination and to have hearsay evidence excluded by admitting into evidence Government's Exhibits 4 and 6 and testimony on other medical reports and in permitting the government to offer testimony and to cross-examine witnesses in regards to these matters without limiting instructions insofar that said exhibits, evidence, testimony and cross-examination permitted the substantive use of reports and testimony which contained diagnostic or expressions of opinions and findings or conclusions of doctors not present to testify?"

This attack, of course, is levelled against the army psychiatric report, signed by Dr. Berc, page 17 *ante*, and the staff report signed by Dr. Glotfeltz, page 23 *ante*. The report of Dr. Fain was introduced, but he appeared and tes-

tified. It must also be noted that the report signed by Dr. Glotfeltz, no longer with the Springfield Medical Center, was specifically denominated at its top in capital letters as the "REPORT OF PSYCHIATRIC STAFF". Dr. Fain was a member of that staff, indeed its deputy chief, and had become chief between his dealings with Davila and his appearance on the stand.

The Springfield report had been furnished to defense counsel in March, before the trial began in May. The mother of the defendant and all the doctors had seen it. The defense doctors had considered it in connection with their own views, although they disagreed with it. The defense injected the report, by reference, in its re-direct examination of Dr. Bennett, page 20 *ante*. This was before the government introduced the report on re-direct when Dr. Fain testified.

■ It is true that opinions as to sanity contained in hospital records are not admissible under the Business Records Act, 28 U.S.C. § 1732, and such an opinion is receivable only if the expert rendering it is made available for cross examination, Birdsell v. United States, 5 Cir., 1965, 346 F.2d 775, 779. But the rule does not stop there. Expert witnesses available for cross examination may use such records as the basis for an opinion without the proponent having to call every person who made a recorded observation, Id. at 779.

More specifically, a physician making a diagnosis must necessarily rely on observations and tests made by others and recorded by them. Records sufficient for diagnosis in the hospital ought to be enough for opinion testimony in the courtroom, Id. at 779, 780.

We next consider a similar situation in United States v. Harper, 5 Cir., 1971, 450 F.2d 1032.

■■ Part II of that opinion demonstrates that there was no error in permitting Dr. Fain to say that he had Davila for the purpose of determining his competency to stand trial, that there

was no error in reading to defense doctors the statements of doctors from Springfield by way of cross examination or impeachment, that there is a difference between admitting such reports directly as proof of matters they contain and doing so for impeachment purposes.

The opinion concluded with the following highly important language:

■ Although medical reports containing expert opinions as to the defendant's sanity may not be admitted directly into evidence, they may be used by other experts in arriving at a conclusion as to the defendant's sanity. E. g., Jenkins v. United States, 1962, 113 U.S.App.D.C. 300, 307 F.2d 637 (en banc); Rule 703, Proposed Rules of Evidence for United States Courts and Magistrates, 51 F.R.D. 315, 404 (1971). And if an expert witness considers such reports in reaching his conclusions, it is open to both sides to question him about what weight he gave the reports and why. *See* Brown v. United States, 1967, 126 U.S.App.D.C. 134, 375 F.2d 310, 318; Smith v. United States, 1965, 122 U.S.App.D.C. 300, 353 F.2d 838, 842 & n. 7; Birdsell v. United States, 5 Cir. 1965, 346 F.2d 775, 779; Rule 705, Proposed Rules of Evidence for United States Courts and Magistrates, 51 F.R.D. 315, 406 (1971).

■ The reason for that rule is clear. The issue of the defendant's insanity, when raised as a defense to a criminal prosecution, is to be decided by the jury on the basis of all the evidence. Therefore, although expert opinion evidence on the issue cannot be arbitrarily ignored, it is not binding upon the jury. Rather it is only advisory in nature. Indeed, it is the jury's function to assess the credibility of the expert witnesses and the weight to be given to their testimony. Mims v. United States, 5 Cir. 1967, 375 F.2d 135, 140–143. In a case such as this, in which expert witnesses express different conclusions as to the defendant's mental condition at the time of the alleged offense, it is important that the jury know upon what facts the expert witness bases his conclusion. As we have said on several occasions, "expert opinion as to insanity rises no higher than the reasons upon which it is based." E. g., Nagell v. United States, 5 Cir., 1968, 392 F.2d 934, 936.

■■ Thus, where, as here, an expert witness bases his conclusion as to the defendant's sanity on reports of other physicians, it is entirely proper that the jury know which opinions he credited, which he rejected, and why. As long as the jury is instructed that such hearsay opinions are being introduced solely to test the credibility of the expert witness and not to prove the truth of the matters contained therein, the use of such opinions for that limited purpose does not violate the confrontation clause of the Sixth Amendment.

United States v. Harper, 5 Cir., 1972, 460 F.2d 705, was another bank robbery case, in which the defendant pleaded insanity.

In that case, a psychiatrist from the Medical Center at Springfield, where Harper had been committed for examination, testified that, in his opinion, Harper was sane. Dr. Moreau had access to appellant's medical records and to a report prepared (as in the case now before us) by Dr. Murney. Our en banc decision in United States v. Williams, 5 Cir., 1971, 447 F.2d 1285, was cited to the effect that expert testimony may be based on sources of information of a type reasonably relied on by experts in forming their opinions or inferences on the subject. *Birdsell, supra,* was likewise cited and discussed in the following clear and meaningful language:

In addition, we held in a closely analogous case, Birdsell v. United States, 5 Cir. 1965, 346 F.2d 775, cert. den. 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965), reh. den. 383 U.S. 923, 86 S.Ct. 900, 15 L.Ed.2d 680 (1966), that although it is preferable for the doctor who examined the defendant to testify, a psychiatrist who

has reviewed all of the records and attended a staff conference with the examining doctor is qualified to give his opinion as to whether the defendant was sane at the time of the commission of the crime. Here, Dr. Moreau based his opinion upon a brief psychiatric staff examination of the appellant at which Dr. Moreau was present, medical reports which consisted of a psychological examination, routine laboratory tests and electroencephalogram, and a staff evaluation. We therefore find no reversible error occurred by allowing Dr. Moreau to testify, even though Dr. Murney was present and available to testify.

Counsel for appellant says the incurable vice is that the jury received no limiting instructions as to the use of these reports. We are of the opinion, however, that this requirement was not applicable to the two Springfield reports. The main report showed specifically that it was a staff report. Dr. Fain was a member of the staff, although a deputy chief. He had personally signed the second, attached report. He was available for cross examination on both reports. The reports had been extensively referred to on all sides prior to admission, which took place on the re-direct examination of Dr. Fain.

■ The army records of the psychiatrical examination of December 12, 1969, are, of course, different. None of the army doctors were present for cross examination. The trial record reveals, however, that this report was extensively referred to for purposes of cross examination and attempted impeachment, and it was considered by defense psychiatrists as a part of their opinion forming process. Moreover the defense turned the report to its own advantage, by witnesses and otherwise, as a basis for showing the rapid mental deterioration suffered by Davila after 1969. The focal issue was Davila's condition two years later, August 5, 1971. We are simply unable to perceive where the absence of the limiting instructions prejudiced the defendant, considered within the context of this wide ranging foray into Davila's mental status over a long period of time. It was simply a paper, dealing with Davila's condition two years before the event, whereas, the jury had seen and heard in person a long array of experts, possessed of the most imposing credentials, grappling over the mental status as it existed on robbery day. This small pebble in the road is not enough to overturn the whole wagon.

## IV. FAILURE TO CHARGE ON THE PRESUMPTION OF INNOCENCE

Appellant says that he is entitled to reversal because the trial judge failed to charge on the presumption of innocence. He cites Helton v. United States, 5 Cir., 1956, 231 F.2d 654:

"It is necessary to consider only the first specification of error to the effect that the district court erred in failing to charge on the presumption of innocence. Appellant's exception to such failure duly reserved must be sustained. Coffin v. United States, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481."

In the case now before us, before any testimony was heard, the trial court made the following statement to the jury:

"That the defendant is presumed to be innocent until and unless his guilt is established beyond a reasonable doubt."

At the conclusion of the case the Court told the jury:

"As I told you in the beginning, and I will tell you again, in a criminal case there is no obligation of the defendant to prove his innocence. The burden of proving the guilt of the defendant rests on the prosecution, that burden never shifts. The burden cannot be sustained unless and until proof is offered by the Government in the case that convinces you beyond a reasonable doubt of the guilt or insanity of the defendant."

In his opening argument the United States Attorney told the jury that the defendant was "cloaked in the presump-

tion of innocence, so that the burden of proving his guilt is upon the Government". He further said, "It is not until the evidence produced by the United States is sufficient beyond a reasonable doubt that this cloak of innocence is removed from this Defendant. That is one protection that he has".

Of course, counsel do not instruct the jury on the law, but we do not have here such a case as *Helton*, where there was no instruction on the presumption of innocence. The trial judge told the jury, at the outset, of the presumption of innocence. At the close he said, "As I told you in the beginning, and I will tell you again, in a criminal case there is no obligation of the defendant to prove his innocence". To say that this jury tried this case while unaware of the presumption of innocence would be to indulge in appellate speculation, although this is a good place to emphasize that trial judges should be careful to give the instruction on the presumption of innocence at the close of the case, so as to leave no room for controversy on this subject.

## V. THE SUFFICIENCY OF THE EVIDENCE

Appellant says that the evidence was insufficient as a matter of law to establish beyond a reasonable doubt that Davila was not insane within the meaning of *Blake*. We disagree. See United States v. Roberts, 5 Cir., 1972, 470 F.2d 1190.

The jury had to choose between the conflicting opinions of expert witnesses, which it did. It was entitled to consider that immediately after the robbery and the division of the proceeds Davila fled the Country, to Puerto Rico, from which it could be reasonably inferred that he was well aware that he had committed a crime and was getting out of the way as speedily as possible. Morever, the jury was entitled further to consider that he knew enough of the nature of what he had done to inquire upon his return whether the situation had "cooled", etc. These were facts, not opinions.

The judgment of conviction is affirmed.

The case, as heretofore indicated, will be remanded for the imposition of a lawful sentence.

Affirmed and remanded.

WISDOM, Circuit Judge (dissenting):

I respectfully dissent.

I would hold that the trial judge exceeded the bounds of judicial discretion in refusing to permit the prosecuting attorney to take the stand to correct apparently perjured testimony offered by his own witness.

This case is freakish but one that involves the broad principle overriding all rules of the game in a system based on the fiction that a trial is a duel between two equal adversaries. That principle is the concept of fundamental fairness. It is what due process is all about. Brady v. Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 rests squarely on it.

In *Brady* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 87, 83 S.Ct. 1196. But, the Court says, the prosecutor did not suppress any evidence; he made it known to the defendant's counsel and to the trial judge; and the trial judge, after weighing competing values, properly exercised discretion in declining to allow the prosecutor to testify.

This reasoning does violence to the principle of fundamental fairness in trial process. If the prosecutor had withheld the information, unquestiona-

bly *Brady* would have controlled this case. The referee's ruling here had the same effect of suppressing evidence favorable to the accused as if the evidence had 'been withheld by the prosecutor.

A criminal trial is unlike a football game. The referee's decision to allow a fifth down is not subject to review. The trial judge's ruling is more a clearly erroneous call than a judgment call, but in this contest even the referee's judgment calls are subject to review.

Defense counsel fully protected the defendant's rights. He entered an objection, based on *Brady*, as soon as Mrs. Rosch gave the disputed testimony. During the recess that followed the prosecutor offered to testify that contrary to what Mrs. Rosch had said, she had not told him that she could identify Davila-Nater. When the trial resumed, defense counsel called the prosecutor as a witness. The trial judge refused to allow him to take the stand. Defense counsel objected. The prosecutor was in court: there was no obligation to substitute a stipulation for live testimony and there is no reason to think that the trial judge would have permitted the admission of any stipulation, written or oral, after having refused to allow the prosecutor to testify.

There is no doubt that the ruling prejudiced the defendant. Mrs. Rosch's testimony surprised the defense counsel. In his opening statement the prosecutor had said that Mrs. Rosch would not identify Davila-Nater. If he had been allowed to take the stand his testimony would have shattered or at least cast doubt on the credibility of the only eyewitness who was not a co-conspirator. It is meaningful indeed that the jury acquitted the defendant of the charges based on the second robbery—when the teller was unable to make an in-court identification.

I would reverse for a new trial. The district judge's ruling was such an abuse of discretion as to violate the principle of fundamental fairness that constitutes the core of procedural due process.